495 P.2d 453

**ARIZONA BOARD OF REGENTS et al.,**
Appellants,

v.

James L. HARPER et al., Appellees.

No. 10596.

Supreme Court of Arizona,
In Banc.

April 6, 1972.

Gary K. Nelson, Atty. Gen., Phoenix, by John S. O'Dowd, Asst. Atty. Gen., Tucson, for appellants.

William J. Risner, of Risner, Wolf & Raven, Tucson, for appellees.

HAYS, Chief Justice.

On January 10, 1969, seven University of Arizona students named Harper, Dobras, Logan, Lawrence, Murray Alan McBride, and Judith McBride, sued the Arizona Board of Regents (hereinafter referred to as the Board) for the purpose of forcing the Board to reclassify them as residents' of Arizona and to refund the nonresident tuition they had paid, and asking the court to declare the one-year residency unconstitutional. Nonresidents must pay more than $400 tuition each semester, over and above what residents must pay. The action was originally brought for a writ of mandamus. Two subsequent actions were brought for administrative review under A.R.S. § 12-901 et seq.

On May 12, 1970, plaintiffs amended all three of their complaints to eliminate any prayer for mandamus or administrative review and to request only declaratory judgments under A.R.S. § 12–1831. It was stipulated that the three cases be consolidated for trial to the court without a jury.

That trial court found that all of the plaintiffs were residents of Arizona and had been improperly charged nonresident tuition; that each plaintiff was entitled to a refund of the overcharge; that the one-year residency requirement was unconstitutional; and that the case was controlled by Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600. The Board appealed to the

Court of Appeals, on whose petition we ordered the case transferred to us for final disposition.

The Board had previously adopted the following rule which was published in the annual University catalogue:

"A student to be considered a legal resident of Arizona for the purpose of registering at the University of Arizona must meet the requirements and must present evidence thereof as follows:

. . . . . .

"If Over 21 Years of Age—that legal residence in the state has been established (independently of the circumstance of attendance at an Arizona institution of learning) for at least one year next preceding the last day of registration for credit, and that he is eligible to become a registered voter. . . ."

■ Plaintiffs contend that the Board is without authority to adopt a rule requiring residence of one year before a student may be classified as a resident. A.R.S. § 15–725 provides that the Board shall:

"Enact ordinances for the government of the institutions under its jurisdiction.

. . . . . .

"Fix tuitions and fees to be charged and graduate the tuitions and fees between institutions and between residents, nonresidents, and students from foreign countries, . . ."

■ Plaintiffs' position is that the Board has no inherent powers and that the statute does not delegate to the Board the power to make this specific rule. Plaintiffs overlook the fact that the Board has not only the powers expressly delegated to it but also such powers as may be reasonably implied for the purpose of effectuating its purposes. As John Marshall once wrote:

"Let the end be legitimate . . . and all means which are . . . plainly adapted to that end . . . are constitutional." McCulloch v. Maryland, 4 Wheat 316, 4 L.Ed. 579.

■ Plaintiffs argue that the Board's one-year requirement violates Article 11, Section 6, of the Arizona Constitution, A.R.S. which provides that the University shall furnish instruction to its students "as nearly free as possible." We believe that for all practical purposes that contention was settled by Board of Regents of the University of Arizona v. Sullivan, 45 Ariz. 245, 42 P.2d 619, in which we said:

"Defendant insists that [Sec. 6, Art. 11 of the Arizona Constitution] means instruction shall be entirely free, and therefore contends that, because the University has fixed a schedule of fees to be paid by students . . . it has violated said section 6. We think the language of the Constitution refutes this contention. There is no suggestion that the fees, rentals, etc., are excessive or other than reasonable, or are not as nearly free as possible." p. 263, 42 P.2d p. 626.

Plaintiffs' principal attack, however, is based upon the position that the one-year residency requirement is a violation of the Due Process, Equal Protection, and Privileges and Immunities clauses of both the state and federal constitutions and a violation of the Interstate Commerce clause of the federal constitution. In Shapiro, *supra*, the United States Supreme Court invalidated a one-year residency requirement where it had been imposed to defeat a new resident's right to receive a *state welfare allowance*. Plaintiffs attempt to apply the reasoning of *Shapiro* to reach the conclusion that a term of residence may not be made a prerequisite for relief from *payment of tuition*. *Shapiro* was also the basis of the trial court's judgment. We think that the cases are entirely different. One who contemplates traveling to a different state will give much more thought to the fact that upon arrival, his food and shelter requirements previously covered by his monthly welfare check will not be met for a considerable period of time. One who knows that his welfare check will continue to arrive, or who is not on welfare, will not be deterred so easily from the trip simply because he will have to pay nonresident tuition if he desires to attend college at his destination.

It should also be noted that the Court, in *Shapiro, supra,* specifically pointed out:

"We imply no view of the validity of waiting-period or residence requirements determining eligibility to vote, *eligibility for tuition-free education,* to obtain a license to practice a profession, to hunt or fish, and so forth. Such requirements may promote compelling state interests on the one hand, or, on the other, may not be penalties upon the exercise of the constitutional right of interstate travel." (n. 21 of the opinion.) (Emphasis added).

Subsequent to the filing of briefs in the instant case, the United States Supreme Court, in a six-to-one decision, rendered its opinion in the case of Dunn, Governor of Tennessee v. Blumstein, 405 U.S. ——, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972). In that case, the Court struck down a one-year durational residence requirement to vote in Tennessee. We can assume that had the *Dunn* case been available earlier, plaintiffs would have argued that the reasoning in it, like *Shapiro, supra,* requires the conclusion that a similar residence requirement for free tuition must also be invalidated. Again, we consider the cases to involve vastly different considerations. For example, some of the following things said in *Dunn, supra,* are not applicable to the instant case:

"Nor has Tennessee ever disputed that appellee was a bona fide resident of the State. . . . By denying some citizens the right to vote, such laws deprive them of 'a fundamental political right' . . . a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction. . . . Statutes distributing the franchise 'constitute the foundation of our representative society. . . . It has long been established that a state may not impose a penalty upon those who exercise a *right guaranteed* by the Constitution. . . .' It is impossible to view durational residence requirements as *necessary* to achieve that state interest. . . . As long as the State relies on the oath-swearing system to establish qualifications, a durational residence requirement adds nothing to a simple residence requirement. . . . As long as the State permits registration up to 30 days before an election, a lengthy durational residence requirement does not increase the amount of time the State has in which to carry out an investigation into the sworn claim by the would-be voter that he is in fact a resident. . . . If the State presumes residence in the county after three months in the county, there is no rational explanation for requiring a full 12 months presence in the State. . . . Tennessee has at its disposal a variety of criminal laws which are more than adequate . . . [so that] it can hardly argue that broadly imposed political disabilities such as durational residence requirements are needed to deal with the evils of fraud. . . . A state does have an interest in limiting the franchise to bona fide members of the community. But this does not justify or explain the exclusion from the franchise of persons, not because their bona fide residence is questioned, but because they are recent rather than long-time residents." (Emphasis added.)

In view of the differences between the instant case and *Shapiro, supra,* and of the fact that many of the arguments in *Dunn, supra,* are inapplicable here, we are unwilling to extend the invalidation of durational residence requirements to the question of who has to pay tuition in the universities of the state of Arizona.

There is ample authority for upholding the constitutionality of durational residence requirements for tuition purposes. In 55 Minn.L.Rev. 1139, we find the following statements:

"Where the resident-nonresident tuition classification has been attacked on constitutional grounds, the courts have *always* upheld the state's right to charge nonresidents higher tuition than residents. P. 1147 (emphasis added).

. . . . . .

"In upholding nonresident tuition the courts have found it enough to say that nonresident tuition involves a reasonable classification and is rationally related to the legitimate state object of financing the state university. Nonresident tuition has never been scrutinized under the 'compelling interest' standard. . . . Nonresident tuition would have to be judged under that standard if it were found to chill or to penalize the right to travel interstate.

"Undoubtedly nonresident tuition discourages some students from traveling to other states to go to college. However, the right to travel has not yet been extended so far as to protect against the type of infringement which nonresident tuition creates." P. 1149.

. . . . . .

"To be domiciled in a state, one must have a bona fide intent to make that state his home. In the case of a student, the requisite intent is often very difficult to prove. During the years when a student is attending college, his plans for future residence are usually vague and uncertain. Also, little reliance can be placed on any statement of intent by the student, since the student knows that he will realize a substantial reduction in tuition by being classified as a resident. The courts, therefore, allow the states to require a student to reside in the state for one year, as evidence of his bona fide intent to remain permanently, before according him resident tuition status." P. 1158.

In addition to this law review article, there are a number of cases which are directly in point. In Kirk v. Board of Regents of the Univ. of Calif., 273 Cal.App. 2d 430, 78 Cal.Rptr. 260 *(post-Shapiro)*, the Court refused to apply the test of compelling state interest, referring to *Shapiro* footnote 21 as being "significant." In Starns v. Malkerson, 326 F.Supp. 234, a *post-Shapiro* case, a three-judge panel of the federal district court for Minnesota upheld the state university's one-year residence requirement. In *Kirk*, an appeal to the United States Supreme Court was dismissed without an opinion; in *Starns*, the United States Supreme Court affirmed without an opinion. Another *post-Shapiro* case reached the same result: Thompson v. Board of Regents of the Univ. of Nebraska, 187 Neb. 252, 188 N.W.2d 840.

Landwehr v. Regents of the Univ. of Colorado, 156 Colo. 1, 396 P.2d 451; and Clarke v. Redeker, D.C., 259 F.Supp. 117, also upheld the waiting period, though both of these were decided prior to *Shapiro, supra*. However, the *Clarke* case was affirmed by the Court of Appeals, Eighth Circuit, 406 F.2d 883, and certiorari was denied by the United States Supreme Court, 396 U.S. 862, 90 S.Ct. 135, 24 L.Ed.2d 115 *after* it had decided *Shapiro, supra*.

 As opposed to the above-cited cases upholding the residence requirements *for tuition purposes*, we have found none holding to the contrary. We are, therefore, following an unbroken line of cases when we adopt as the Arizona rule the following language from *Thompson, supra*:

"The state has the power to classify students on the basis of residency for the purpose of charging tuition, and to enforce such a classification a state has the power to define a resident for purposes of tuition differently than a resident for other purposes. . . . the Legislature may reasonably require that the bona fides of the residence be demonstrated independent of the equivocal nature of mere physical attendance by a nonresident at a school in the state." 188 N.W.2d at 843–844.

The rule we have adopted provides the only practical way of determining the fact of residence claimed by a new student. To permit a student to announce his intention of becoming a permanent resident of Arizona on the day of his arrival; to accept his biased and self-serving statement as · the whole truth; and to permit him to reinforce his statement by registering his car in this state, and securing a driver's license in this

state, would simply place a premium on deception.

The record indicates that the enrollment at the University of Arizona was approximately 20,000 at the time of the trial in this matter, of which 5,000 were nonresidents who paid over $4,000,000 in tuition fees each year. It is common knowledge that practically every university collects less in fees than the cost of operating its facilities. It is likewise clear that in the present state of our economy these costs cannot be cut, and that taxes are near their upper limits.

At the same time, it must be recognized that the nonresident students bring to the campus a pollinating effect in the form of new ideas from other parts of the country and of the world. They prevent sterility and provincialism in local thinking. The schools with the most cosmopolitan student bodies are among those most highly regarded in America today. A school which prohibits the enrollment of nonresidents is doomed to mediocrity. It is impossible to overrate the stimulating effect of bright young students mingling and conversing with others who have grown up in vastly different environments and who have brought with them entirely different points of view.

The term "residence," as used in the statute in question, in reality refers to "domicile"—a term which has been developed and refined over the centuries. The subject of domicile occupies 58 pages of volume I of the Restatement (Second) of Conflict of Laws. Certain basic guides may be gleaned from the text. Domicile is primarily a state of mind combined with ac-actual physical presence in the state. Either, without the other, is insufficient. One's domicile remains unchanged until a new one is acquired. Theoretically, one who goes from one state to another with the actual intention to remain and make his home in the second state, acquires a domicile in the second state immediately, and "domicile" is equivalent to "residence" for tuition purposes. In a hypothetical case, the answer is easy since the facts are assumed. In an actual case, the decision is difficult because the facts are rarely unequivocal. As the Restatement puts it,

"The rules for the acquisition of a domicil of choice are relatively simple; the difficulty comes in applying them in situations where the person's contacts are more or less equally divided between two or more states. Brief reference will here be made to burden of proof and to the various types of evidence that are frequently relied upon in such cases and to the relative weight that is usually given them. P. 81.

"*Burden of Proof.* A domicil is not lost until another has been acquired, and the burden of establishing a change of domicil is upon the party who asserts it. . . . This principle is heavily relied upon by the courts. The amount of evidence necessary to satisfy this burden depends upon the facts of the particular case. Less is required, for example, when the person has been absent from his domicile for a considerable period of time. P. 81.

"*Evidence.* In addition to legal capacity, the requisites for the acquisition of a domicil of choice are physical presence and a certain attitude of mind toward the place in question. . . . Physical presence raises no particular problem of proof, and the cases have been concerned almost entirely with the required attitude of mind. P. 81.

. . . . . . .

"*Proof of Intention.* A person's intentions must be determined in the light of his declarations and other conduct and of the circumstances in which he finds himself. The evidence will often be equivocal, and the principal difficulty in domicil cases lies not so much in the rules themselves as in the evaluation of the facts, especially with respect to intention . . ." P. 72.

A very clear impression comes through from the transcript that the registrar of the University of Arizona, who chairs the "Res-

dence Committee," is thoroughly conversant with the concept of "domicile" and all of the factors that are to be considered in determining it. It is also evident that he has acted in good faith in the cases of these plaintiffs and at the same time has properly kept in mind the Board's rule. However, the functioning of the decision-making process by his subordinates has not been of the same quality as his performance.

Some 20,000 students register in a few days at the beginning of each semester. They do this by lining up and passing table after table, at each of which they give or receive some document pertinent to registration. One of these documents is an "Admission Affidavit" which every student fills out and either mails in, or brings in when he registers. These affidavits are the basis upon which an initial routine determination of residence is made. Unfortunately, this determination consumes so much time that the registrar has to delegate the decisions to employees of his office who are not as well informed as he on the criteria of domicile. In order to help these employees decide difficult cases, they were given a sheet of guidelines which are not too clear and which they do not completely understand. The students were never shown this guideline sheet, and plaintiffs' attorney was told that there was no such sheet! As a result, many students were told some things that were incorrect. For example, they were told that they could never acquire a residence in Arizona while taking a full load of studies, and that they would have to drop out, or substantially reduce the number of courses taken for one year, before they could acquire a resident status. Again, the sheet contains the statement that a student may appeal to the Residence Committee within 30 days, but many of the students were not told that they had such a right, or that there was a 30-day limit on appeals. Also, the sheet requires a new affidavit from any student desiring to change from nonresident to resident status. The student is not told of this requirement, and the registrar testified that the Committee did not insist that the new information be under oath.

Proper procedures must be set up and publicized. The administrative decision of residency made by university employees in the first instance appears to be appealable to the Residence Committee, thus providing an administrative review within the university milieu. Since no appeal has been provided from the Committee to the Board of Regents, the appeal to the Committee exhausts a student's administrative relief and his further efforts to get a satisfactory ruling should be under the Administrative Review Act, A.R.S. § 12–901 et seq., rather than by an action for declaratory judgment. Every nonresident student should be so advised, and should be told how much time he has to file such an action.

In addition to the semi-confidential guideline sheet given to the Residence Committee, the record also contains a five-page document purporting to tell the Committee how to handle contested nonresidence cases. Some of its contents are eminently correct; others are just as obviously in error. In particular, plaintiffs object to the statement in that document to the effect that the students' proof of residence must be beyond a reasonable doubt. We see no justification for such a test in a civil case but hold that the student must prove his position by clear and convincing evidence. We adopt this burden of proof because proof of residence involves basically subjective material which is conditioned by the advantage to the declarant. A.R.S. § 12–903.

Each of the plaintiffs testified at the trial. Plaintiff Dobras is the only one whose status was clearly that of a resident and, but for the one-year requirement, he would have been exempt from payment of the nonresident tuition fees. The Board recognized this and, upon his protest, reclassified him the second year as a resident and refunded the nonresident tuition which he had paid.

As to each of the other plaintiffs, there were one or more facts which militated

against the bona fides of the expressed intent to become a permanent resident of Arizona.

■ Harper failed to file state income tax returns in Arizona although he filed them in Massachusetts and New York. In addition, he testified that:

"The intent was that I can't say it was 100% . . . if I like[d] Tucson . . then I would stay."

·At the time of the trial, he still drove his car under an out-of-state driver's license. When back in New York during vacation he had no hesitation in stating, in writing, on an application for a student loan, that he was a resident of New York. He did this "because it made it easier to get the loan." With these ·facts before the Committee, and with the burden on the student to prove his change in domicile, there was ample evidence to sustain its classification .of Harper as a nonresident.

■ Plaintiff Murray filed no Arizona income tax returns. He drove with an out-of-state driver's license until July of 1969, at which time he procured an Arizona license because "[b]efore this Residence Committee I felt like I needed something else, so I got it then." His parents helped pay his school expenses and, on applications for student loans given to a Riverside California bank, he gave his parents' California home as his address in both 1968 and 1969.

■ Plaintiff Logan admits that he didn't get the intent to become an Arizona resident until the second semester of the 1966–67 school year, as "the state kind of grew on me." His parents supplied half of his school expenses, including a car that remained in his father's name with a California license. On his federal income tax returns filed in Arizona he gave his residence address as California, and filed no Arizona state income tax return. His apartment was rented for only the nine months of the school year. He intended to marry a girl in California in the summer of 1970.

■ Plaintiff Alan McBride made no protest of his nonresident classification until after he had been in school full time for three years. In August, 1968, he married, and his wife, Judith, is also one of the plaintiffs herein. The decision to live in Arizona was, according to him, made then. His wife had been teaching in Tucson and intended to continue doing so. Both worked in California in the summer of 1969 because wages there were higher. His parents paid his full tuition all during the time he was in school. According to his testimony, his older brother "became a legal resident [of Arizona] . . . before he finished school" but returned to California upon graduation and has remained there ever since.

■ Plaintiff Lawrence, at the time of the trial, had been a full time student since the fall of 1966 and expected to graduate in 1970. He stated that he came to Arizona because of student unrest in his home state of California and because of allergies. When questioned about what his intent was when he enrolled in 1966, he stated:

"I had only been here a month or maybe two weeks, by the time . . . registration occurred, so I couldn't be positive about that then."

Most of his expenses were paid by his grandfather who lived in California. His future plans are uncertain. Sometimes he talks about taking law; at other times he talks about working for Continental Airlines, or for his brother. In 1969 he filed an Arizona state tax return. In at least one year previous to that, he filed a federal return in California. He attended summer school in California in 1967 and 1968, at which times he gave his residence as California and thereby avoided paying nonresident tuition there. In the spring of 1969 he filed a California state income tax return giving his residence as California. By September, 1969, he had lived in Arizona for only six months after becoming twenty-one years of age.

It is a somewhat sad commentary upon the contemporary American scene that in a

lawsuit in which the plaintiffs are presumably selected to make the strongest possible test case, the majority of those plaintiffs are willing to subordinate truthfulness to expediency, when money is involved. In the past, we have taken the position that applicants for the state bar, who simultaneously apply to several states and allege residency in each, are not equipped with sufficient moral fiber to practice law in this state.

We hold that in the case of each of the plaintiffs in this case, except Dobras, the Board was perfectly within its rights to disregard some of the testimony and classify these plaintiffs as nonresidents, on the ground that they had not sustained their burdens of proof. We further hold that it is the Board's privilege and duty to hear all of the pertinent evidence and to try to sift out the truth in order to properly classify applicants for a resident status. The Board will have to revise its procedures, properly publicize the students' rights to be heard, to appeal, and to go to court if administrative review is desired. Without such revised procedures there can be no due process.

In the instant case, the holding of the trial judge that all of the plaintiffs herein were residents of Arizona, can be explained only by the fact that he must have been using the test usually applicable to civil cases; namely, that the proof need be only by a preponderance of the evidence. Had he used the test of clear and convincing evidence, his conclusions could not have been in plaintiffs' favor.

In examining the complete transcript of all of the testimony in detail, we find it is so full of excuses, contradictions and impeachments from the written and oral testimony of the plaintiffs that, except in the case of Dobras, none of the proof is clear and convincing.

The case is therefore reversed.

CAMERON, V. C. J., and STRUCK-MEYER, LOCKWOOD and HOLOHAN, JJ., concur.