688 P.2d 986

### ST. JOSEPH'S HOSPITAL AND MEDICAL CENTER, an Arizona corporation, Plaintiff-Appellee,

v.

### MARICOPA COUNTY, Arizona, a body politic, Defendant-Appellant.

### No. 17556.

Supreme Court of Arizona,
En Banc.

Sept. 26, 1984.

Reconsideration Denied Oct. 23, 1984.

Gammage & Burnham by Richard B. Burnham, Grady Gammage, Jr., Phoenix, for plaintiff-appellee.

Thomas E. Collins, Maricopa County Atty. by Gordon J. Goodnow, Jr., Phoenix, for defendant-appellant.

FELDMAN, Justice.

Maricopa County appeals from an adverse partial summary judgment in which the trial court held that the County was obligated by statute to reimburse St. Joseph's Hospital (St. Joseph's) for emergency care rendered to three undocumented Mexican nationals living in Maricopa County. We have jurisdiction, Ariz. Const. art. 6 § 5(3) and transferred the case to this court pursuant to Ariz.R.Civ.App.P., Rule 19, 17A A.R.S.

## FACTS

The case involves three patients treated at St. Joseph's for emergencies resulting from three different accidents. Following an automobile accident in which he received injuries resulting in quadriplegia, Pedro Alvarado was admitted as an emergency patient at St. Joseph's on February 21, 1981.[1]

---

1. We omit recitation of the facts pertaining to the other two patients. They were admitted on different dates, with lesser injuries, but the operative facts are the same in all three cases.

Two days later Maricopa County was notified that Mr. Alvarado was being treated at St. Joseph's. The hospital determined that Mr. Alvarado was indigent,[2] and was living and working in Maricopa County at the time of the accident. Therefore, it billed Maricopa County for the services rendered to Mr. Alvarado. Alvarado remained at St. Joseph's until October, 1982. Emergency care was completed long before Alvarado's release, and for the majority of his stay he received only skilled nursing care at St. Joseph's. Although the County had been notified of Mr. Alvarado's condition, it did not seek to transfer him to a county facility capable of providing appropriate treatment. Claiming that because Mr. Alvarado entered the United States illegally he could not be considered a resident of Maricopa County, the County refused to reimburse St. Joseph's. Even under Medicare/Medicaid rates Mr. Alvarado's bill exceeded $130,000. The bills for the other patients were much smaller.

St. Joseph's filed an action in January, 1982, seeking reimbursement from the County for the care rendered to the three patients. In defending, the County argued that "illegal" status made it impossible, as a matter of law, for the three men to be considered "residents" of Maricopa County. Following discovery, St. Joseph's and the County filed cross-motions for summary judgment. The trial court granted St. Joseph's motions and formal judgment was entered on December 29, 1982. Maricopa County filed a notice of appeal. We transferred the case because of the need for a

final resolution of the important and recurring legal problem. Rule 19, *supra.*

## FACTUAL ISSUES

We first dispose of the county's contention that there are genuine issues of material fact concerning (A) whether the entire hospital stay of each patient required emergency care and (B) assuming an undocumented alien can be a "resident," whether the three patients were residents of Maricopa County. Summary judgment having been granted, we view the evidence most favorably to the County. *Green Acres Trust v. London,* 141 Ariz. 609, 611, 688 P.2d 617, 619 (1984). Nevertheless, we find the County's position unpersuasive.

### A

■■■ It is uncontroverted that each patient was an "emergency medical patient" at the time of admission to St. Joseph's. *See* A.R.S. § 41–1831(7). A.R.S. §§ 41–1837(A) and 11–297.01(B) govern the procedures for the transfer of indigent emergency patients from the receiving facility to a county designated facility.[3] The hospital initially receiving the indigent emergency medical patient is obligated to continue to provide needed emergency care so long as it is "medically indicated." *Thompson v. Sun City Community Hospital, Inc.,* 141 Ariz. 597, 688 P.2d 605 (1984). Even though the treatment required by each of the three patients ceased being "emergency care" at some point during their hospital stays, the County refused to accept the

---

**2.** Alvarado had almost no economic resources and became indigent because of medical costs incurred quite early in his hospitalization. *See St. Joseph's Hospital and Medical Center v. Maricopa County,* 130 Ariz. 239, 241–43, 635 P.2d 527, 529–31, (App.1981).

**3.** When an indigent emergency medical patient is received by an emergency receiving facility from a licensed ambulance, the county shall be liable pursuant to § 11–297.01, ... to the facility for the reasonable costs of *all medical services* to such indigent by the facility *until such patient is transferred by the county to the county hospital, or some other facility designated by the county.*

A.R.S. § 41–1837(A) (emphasis supplied).
A.R.S. § 11–297.01(B) reads, in relevant part:
The county shall be liable for payment of all costs retroactive to the inception of treatment incurred by a private hospital ... arising from emergency treatment and medical care administered at such hospital for a patient qualified for such care and treatment under the provisions of article:

    \*    \*    \*    \*    \*    \*

2. When the county does not move the patient from the private hospital ... within twelve hours after being notified by the private hospital ... of the location and condition of the patient.

patients for continuing care. Cessation of hospital care may not be medically indicated despite the cessation of the emergent condition. If a transfer to a county institution cannot be effected because of the County's refusal to accept the patient, the private hospital may not simply release a seriously ill, indigent patient to perish on the streets. Neither may the County avoid its obligation to reimburse the private hospital for the continuing care of the indigent who was initially admitted for emergency care, simply by refusing to transfer the patient once the County has been properly notified of the condition and location of the patient. Reading A.R.S. §§ 41–1837(A) and 11–297.01(B) together, it seems evident that the County is liable for the entire cost of the patient's medical care, even after the emergent condition has been treated, when, after proper notice, it has failed to transfer the patient. *St. Joseph's Hospital and Medical Center v. Maricopa County*, 138 Ariz. 127, 130, 673 P.2d 325, 328 (App. 1983).

### B

■ Deposition evidence was submitted to make a prima facie showing of residency of each of the three patients at the time they were admitted to St. Joseph's. Although the County questions the "qualifications" of the deponents, it offers no evidence either to counter the factual matters asserted in the depositions or to show that at the time the patients were admitted they intended anything other than to live indefinitely in Maricopa County. The County asks us to infer that two of the patients had no intention of living indefinitely in Maricopa County because they returned to Mexico after being released from St. Joseph's. We do not believe that the fact that the patients moved after being released from the hospital following treatment of injuries received in the accident has sufficient relevance to their intentions

to stay in or leave the county before the injury-producing accident to create a question of fact. The county failed to rebut the factual matters contained in the depositions and affidavits submitted by St. Joseph's. These facts indicated all three patients had lived and worked in the County for substantial periods of time, had homes or established places of residence, had not traveled back and forth to Mexico and had indicated no intention of leaving. There was no issue of fact.

### CAN AN UNDOCUMENTED ALIEN BE A RESIDENT?

■ At the time of the events at issue A.R.S. § 11–291(A) charged the County Board of Supervisors with the authority "to provide for the hospitalization and medical care of the indigent in the county." Also, at that time, A.R.S. § 11–297.01(B) provided that the county reimburse private hospitals for emergency care given to "qualified" patients, and that this reimbursement be retroactive to the inception of care. *See* n. 3 *ante.* Those "qualified" for such emergency treatment are described in § 11–297(A), which requires that the patient be indigent and "a resident of the county for the preceding twelve months." Thus, the issue may be characterized as follows: Under Arizona's statutes is the County's duty to reimburse a private hospital for emergency care delivered to indigents who have been a "resident of the county" relieved merely because the indigents, otherwise bona fide residents, are undocumented aliens? We hold that the County is obligated to reimburse St. Joseph's under the facts of this case because illegal entry into this nation does not disqualify an alien from becoming a "resident" of a county of this state for the purposes of statutes governing emergency medical care.[4]

---

**4.** The parties raise issues involving the equal protection provisions of the Constitutions of the United States and Arizona. We do not engage in constitutional analysis because the issues can and should be decided without reaching the constitutional questions presented. *See State v. Church,* 109 Ariz. 39, 41, 504 P.2d 940 (1973); *County of Maricopa v. Anderson,* 81 Ariz. 339, 341, 306 P.2d 268, 269–70 (1957).

## A

■ "Residence" and "domicile" are not synonomous terms at common law. *Brandt v. Brandt*, 76 Ariz. 154, 158, 261 P.2d 978, 980 (1953); *see also Martinez v. Bynum*, 461 U.S. 321, 330–331, 103 S.Ct. 1838, 1843–44, 75 L.Ed.2d 879 (1983) (see especially footnote 11); 25 Am.Jur.2d (Domicil) 5–9 (1966). However, we have generally treated the statutory usage of the term "residence" as carrying the same connotations as the term "domicile." *See Clark v. Clark*, 124 Ariz. 235, 237, 603 P.2d 506, 508 (1979) (divorce); *Arizona Board of Regents v. Harper*, 108 Ariz. 223, 228, 495 P.2d 453, 458 (1972) (tuition); *Sneed v. Sneed*, 14 Ariz. 17, 21, 123 P. 312, 314 (1912). In *Sneed* the court concluded

> that "an actual bona fide resident" means a person who is in Arizona to reside permanently, and who, at least for the time being, entertains no idea of having or seeking a permanent home elsewhere.

*Sneed v. Sneed*, 14 Ariz. at 22, 123 P. at 314. Residence, then, like "[d]omicile is primarily a state of mind combined with actual physical presence in the state" or county. *Arizona Board of Regents v. Harper*, 108 Ariz. at 228, 495 P.2d at 458. It "involves basically subjective material." *Id.* at 229, 495 P.2d at 459. By this test the three patients were residents of Maricopa County at the time they suffered their accidental injuries resulting in emergency treatment at St. Joseph's.

## B

■ The County contends, however, that impediments to a finding of residency may follow from a person's legal status. This is true of one whose insanity makes it impossible for him to form the requisite subjective intent. *In Re Sherill's Estate*, 92 Ariz. 39, 43, 373 P.2d 353, 356 (1962). A marital relationship may affect the determination of one's "intent" to establish residency. *Bialac v. Bialac*, 95 Ariz. 86, 87,

386 P.2d 852, 853 (1963). A minor takes the domicile of his parents or legal guardian. *McNeal v. Mahoney*, 117 Ariz. 543, 545, 574 P.2d 31, 33 (1977). The rationale for this is apparently "the recognition that juveniles, *unlike adults*, are always in some form of custody." *Schall v. Martin*, — U.S. —, —, 104 S.Ct. 2403, 2410, 81 L.Ed.2d 207 (1984) (emphasis supplied). *See also Matter of Appeals in Pima County Juvenile Action No. S–903*, 130 Ariz. 202, 635 P.2d 187 (App.1981). The County argues that the legal disability to form an intent to reside in such cases should be extended to undocumented aliens because they are not legally in the United States. Therefore, the argument continues, an undocumented alien, whose presence is illegal under federal law and who is subject to deportation by federal authorities when (and if) caught, cannot form the "intent" necessary to remain in any location in this country indefinitely. We do not agree.

> To be sure, like all persons who have entered the United States these [undocumented aliens] are subject to deportation. 8 U.S.C. §§ 1251–1252. But there is no assurance that a [person] subject to deportation will ever be deported. An illegal entrant might be granted federal permission to continue to reside in this country, or even to become a citizen. See, e.g. 8 U.S.C. §§ 1252, 1253(h), 1254. In light of the discretionary federal power to grant relief from deportation, a State cannot realistically determine that any particular undocumented [person] will in fact be deported until after deportation proceedings have been completed.

*Plyler v. Doe*, 457 U.S. 202, 226, 102 S.Ct. 2382, 2399, 72 L.Ed.2d 786 (1982) (the bracketed words are substituted for the words "child" or "children" in the original).[5]

> [I]llegal entry into the country would not, under traditional criteria, bar a per-

---

**5.** "A deportation proceeding is a purely civil action .... [It] looks prospectively, to the respondent's right to remain in this country in the future. Past conduct is relevant only insofar as it may shed light on the respondent's right to remain." *Immigration and Naturalization Service v. Lopez-Mendoza*, — U.S. —, —, 104 S.Ct. 3479, 3484, 82 L.Ed.2d 778 (1984).

son from obtaining domicile within a state.

*Plyler v. Doe,* 457 U.S. at 227, n. 22, 102 S.Ct. at 2400 n. 22;[6] *see also id.* at 240–41 n. 6, 102 S.Ct. at 2407–08 n. 6 (Powell, J., concurring); *Rzeszotarski v. Rzeszotarski,* 296 A.2d 431, 434–36 (D.C.App.1972). *Cf. Toll v. Moreno,* 458 U.S. 1, 67, 102 S.Ct. 2977, 2980, 73 L.Ed.2d 563 (1982) (noting that "nothing in the general Maryland law of domicile renders G–4 visa holders, or their dependents, incapable of becoming domiciled in this state") (quoting *Toll v. Moreno,* 284 Md. 425, 444, 397 A.2d 1009, 1019 (1979), answering the question certified in *Elkins v. Moreno,* 435 U.S. 647, 668–69, 98 S.Ct. 1338, 1350–51, 55 L.Ed.2d 614 (1978)). Given these words from the nation's highest court concerning a field of federal legislation, it is unnecessary to pursue the matter further. There is no federal impediment to an undocumented alien becoming a resident of an Arizona county. We have been cited to no state law which would create such an impediment.

## C

The County draws attention to the Maricopa County Department of Health Services Eligibility Manual which sets forth certain regulations regarding residency. Specifically, Regulation 4.05–3 states that an undocumented alien is ineligible for County subsidized health care. The County contends that this regulation reflects the intent of the state eligibility statutes. We reject this contention. The County regulation is invalid because it seeks to amend a statute enacted by the legislature and impermissibly limits the reach of the statutory language. *Duncan v. Krull,* 57 Ariz. 472, 476, 114 P.2d 888, 889 (1941) ("[r]ules and regulations by an administrative or executive officer or body are always subordinate to the terms of the statute and in aid of the enforcement of its provisions"); *Cabral v. State Board of Control,* 112 Cal.

App.3d 1012, 1015–16, 169 Cal.Rptr. 604, 606 (1980).

As initially enacted A.R.S. § 11–297 contained a single qualification on residency—an indigent had to have been a resident of the county for 12 months before the county was responsible for his medical care. This qualification of the residency requirement was struck down by the United States Supreme Court 10 years ago in *Memorial Hospital v. Maricopa County,* 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974). Since that date the legislature has not sought to qualify the term "resident" as used in the statute in any way. The public policy, animated by statute, "that a general hospital may not deny emergency care to any person without valid cause" (*Thompson v. Sun City Community Hospital,* 141 Ariz. at 601, 688 P.2d at 609) is reinforced by the obligation of counties to reimburse private hospitals for rendering such care to indigent county residents. A.R.S. § 11–297.01(B). A county's attempt to limit the statutory definition of eligibility by administrative regulation, modifying the word "resident" by adding the adjective "legal," restricts the county's duty of reimbursement. Instead of reimbursing private hospitals for emergency medical care rendered to indigent "residents," the county, by its own regulation, seeks to limit its duty to reimbursing only for such care to "legal residents." The legislature is obviously aware of the considerable number of undocumented aliens in our state. Had it wished to limit emergency care to legal residents, or attempt to impose on private hospitals a duty to provide such care to "illegals" without reimbursement, it could have supplied the missing adjective itself. We believe the regulation is inconsistent with the legislature's choice not to limit the statutory language. *Duncan v. Krull, supra.*

Thus, we hold that undocumented aliens may qualify as county residents under the statutes mandating that the county reim-

---

**6.** The county contends that *Plyler* should be limited to special circumstances of children and their access to education. We do not believe that this narrow reading of *Plyler* is warranted.

*Plyler* makes it patently clear that there is no federal impediment to finding that an undocumented person qualifies as a resident of a county of a state.

burse a private hospital for providing emergency medical care. The trial court was correct in granting summary judgment to St. Joseph's. The judgment is affirmed.

GORDON, V.C.J., and HAYS and CAMERON, JJ., concur.

HOLOHAN, C.J., dissenting.