

# THE ATTORNEY GENERAL
# OF TEXAS

October 4, 1988

**JIM MATTOX**
**ATTORNEY GENERAL**

Mr. Pat D. Westbrook
Executive Director
Texas Commission for the Blind
P. O. Box 12866
Austin, Texas    78711

Opinion No. JM-962

Re:    Whether the Texas Commission for the Blind is required to provide services to blind children who are illegal aliens (RQ-1318)

Dear Mr. Westbrook:

On behalf of the Texas Commission for the Blind, you request our opinion on issues concerning the eligibility of undocumented aliens to receive services from the commission. You ask three questions:

> (1) Should the Commission provide services to blind children residing in Texas regardless of their status as legal or illegal aliens?

> (2) Should the Commission provide vocational rehabilitation services to adults who are illegal aliens?

> (3) If the answer to either question (1) or (2) is 'no' is there any reason why the Commission cannot request documentation before providing services to suspected illegal aliens?

For reasons to be discussed below, we conclude that the Texas Commission for the Blind must provide services to blind children eligible to receive such services without regard to their status as legal or illegal aliens. We also conclude that the commission may not deny vocational rehabilitation services to adults who are illegal or undocumented aliens.

I.

A.  Services to visually handicapped children.

The Texas Commission for the Blind operates pursuant to chapter 91 of the Human Resources Code.  The primary responsibility of the commission is to provide services to visually handicapped persons other than welfare services or services provided to children under programs established by educational institutions or other agencies.  Hum. Res. Code § 91.021(a).  The commission may provide services to visually handicapped children to supplement the services of other state agencies.  Id. § 91.028.  The commission is authorized to cooperate with other state agencies and the federal government to achieve these purposes and to implement federal legislation providing for assistance to the visually handicapped.  Id. §§ 91.021(b), (d); 91.028.

The commission provides a number of services to visually handicapped children including blindness prevention services, parental counseling, psychological counseling, educational support, diagnostic and evaluation services, physical training, and orientation and mobility training.  The commission also provides funds for medical operations and adaptive equipment.  These services are provided to children, we are told, without federal funds.

You inform us that the commission believes that it should provide services to blind children who are undocumented aliens by virtue of the United States Supreme Court decision in Plyler v. Doe, 457 U.S. 202 (1982).  In Plyler, the Court held that a provision of the Texas Education Code withholding funds from school districts for the education of children not "legally admitted" to the United States and authorizing school districts to deny enrollment to such children violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution because it did not further a "substantial goal" of the state.  The Commission for the Blind has determined that there is no substantial goal of the state that will justify the denial of services to blind undocumented alien children.  Therefore, it concludes that such children may receive services from the commission.

We agree that the commission should provide its services to visually handicapped children without regard to their immigration status.  However, we need not resort to constitutional principles to resolve this issue, for this question is essentially a matter of statutory construction.  See Attorney General Opinion H-586 (1975).

## B. Children's eligibility for services.

The Supreme Court in <u>Plyler</u> confronted a legislative classification that discriminated against undocumented alien children. It was therefore necessary for the Court to resort to constitutional principles in order to determine whether the legislature could enact such a classification. Here, however, we are not confronted with a discriminatory legislative classification. The legislature has not enacted any criteria concerning a child's eligibility to receive services from the commission other than the requirement that the child have a visual handicap. The commission, presumably pursuant to its authority to promulgate rules governing the administration of its programs, Hum. Res. Code § 91.011(g), has imposed a residency requirement on recipients of services under the visually handicapped children's program. 40 T.A.C. § 169.4. Assuming the commission has authority to adopt such a standard, the residency requirement would not prohibit the commission from providing services to children who are undocumented aliens.

In Attorney General Opinion WW-1274 (1962), this office concluded that the State (now "Texas") Commission for the Blind could provide vocational rehabilitation services to a child who was an alien and whose parents "have never taken out naturalization papers." The relevant statute required the applicant for services to be a resident of the state at the time of filing the application. Although residence is a flexible concept that depends largely upon the circumstances in which it is used, <u>see</u> Attorney General Opinion JM-611 (1986), the attorney general concluded that an applicant needed only to establish bodily presence in the state at the time of application. Thus, Texas law would permit an alien to establish residency for the purpose of receiving services from the commission. <u>See also</u> <u>St. Joseph's Hospital and Medical Center v. Maricopa County</u>, 688 P.2d 986 (Ariz. 1984) (undocumented alien may be a resident of county for purpose of receiving medical assistance under state indigent health care statute). It is therefore of little consequence that the commission has adopted a residency qualification for children's services. Accordingly, your first question is answered in the affirmative.

## II.

## A. Vocational rehabilitation services.

Your second question concerns the availability of vocational rehabilitation services to adult undocumented aliens. The commission provides such services to blind

disabled individuals directly or through public or private agencies. A blind disabled individual is "a person who is blind or who has a visual condition for which medical prognosis indicates a progressive deterioration that may result in a substantial vocational handicap." Hum. Res. Code § 91.051(5). The commission is directed to cooperate with the federal government to accomplish the purposes of federal laws relating to vocational rehabilitation and is ordered to comply with conditions required by the federal government to secure the full benefits of the federal laws. Id. § 91.053(a), (b). Section 91.055 of the Human Resources Code states that the commission "shall provide vocational rehabilitation services to a blind disabled individual eligible for those services under federal law." To ascertain the eligibility of a blind disabled person to receive vocational rehabilitation services from the commission, we must consult the relevant federal law, the Rehabilitation Act of 1973. 29 U.S.C. §§ 701 et seq.

B.   The Rehabilitation Act of 1973.

The Rehabilitation Act was enacted with the purpose of developing and implementing "comprehensive and coordinated programs of vocational rehabilitation and independent living" for persons with handicaps. 29 U.S.C. § 701. The goal of these programs is to "maximize [the] employability, independence, and integration [of persons with handicaps] into the workplace and the community." Id.

In order to be eligible to participate in vocational rehabilitation programs created under the federal act, states must submit to the federal government a state plan for vocational rehabilitation services that fulfills certain conditions specified in the act. Among those conditions is that the state plan shall "provide that no residence requirement will be imposed which excludes from services under the plan any individual who is present in the state." Id. § 721(a)(14); see also 34 C.F.R. § 361.31(a)(2) (1987). The dominant criteria for determining a person's eligibility are

> (1) [t]he presence of a physical or mental disability which for the individual constitutes or results in a substantial handicap to employment; and

> (2) [a] reasonable expectation that vocational rehabilitation services may benefit the individual in terms of employability.

34 C.F.R. § 361.31(b) (1987). These standards strongly suggest that it is improper for a state to impose more restrictive conditions on eligibility so as to deny services to any individual with a qualifying disability. Our review of the relevant federal regulations governing vocational rehabilitation programs revealed no regulation expressly addressing the issue you raise. At a time when Texas law imposed a residency requirement upon the recipients of commission services, including vocational rehabilitation services, this office concluded that the commission could provide such services to aliens "who have never taken out naturalization papers." Attorney General Opinion WW-1274 (1962). With the residency qualification now removed, there is even less reason to conclude that undocumented aliens are ineligible to participate in vocational rehabilitation programs.

The commission, however, does not couch its objection to providing services to adult undocumented aliens in terms of residency. Rather, the commission contends that since it is illegal for undocumented aliens to secure jobs in the United States, the state should not encourage their employment by providing them vocational rehabilitation services. The commission does not refer specifically to any federal law or regulation that supports its decision to deny vocational rehabilitation services to undocumented aliens. Nor do you detail the commission's reasoning for this decision. The commission's argument, however, seems grounded in the notion that federal immigration policy, especially as it concerns the employment of undocumented aliens, forecloses an undocumented alien's eligibility to receive vocational rehabilitation services. We will now consider this aspect of the commission's argument.

C.  Federal immigration policy concerning the employment of undocumented aliens.

Your letter requesting this opinion contains no reference to the federal laws that led to the commission's decision to deny vocational rehabilitation services to undocumented aliens. The commission apparently has in mind the changes wrought in federal law by the Immigration Reform and Control Act of 1986 (the IRCA), Pub. L. No. 99-603, 100 Stat. 3359 (1986). The IRCA makes the most comprehensive change in the federal immigration laws since the McCarren-Walter Act of 1952. N. Montwieler, The Immigration Reform Law of 1986, at 3 (1987). Its primary features include employer sanctions for the hiring of undocumented aliens, a legalization program for certain undocumented aliens living in this country since before January 1, 1982 (amnesty), and

a separate legalization program for temporary foreign agricultural workers. Id. at v. The express purpose of the amendments is to control illegal immigration into the United States. See H.R. Rep. No. 99-682, 99th Cong., 2d Sess., pt. 1, at 45, reprinted in 1986 U.S. Code Cong. & Admin. News 5649. The feature most relevant to the commission's argument is the plan to implement employer sanctions.

The availability of employment has long been recognized as the magnet that attracts undocumented aliens to this country. See Plyler v. Doe, supra, at 228; Note, Developments in the Law: Immigration Policy and the Rights of Aliens, 96 Harv. L. Rev. 1286, 1438-40 (1983). The failure or the inability of the federal government to enforce its immigration laws, coupled with the lack of an effective disincentive to the employment of undocumented aliens, may have led to the perception that such employment received implicit congressional imprimatur. See Plyler v. Doe, supra. Indeed, under the so-called "Texas proviso," it was illegal for an undocumented alien to work in the United States, but it was not illegal for an employer to hire the same undocumented worker. N. Montwieler, supra, at 4. The enactment of employer sanctions confirms that Congress intends to erase this perception.

As a result of the IRCA, it is now unlawful for any person to knowingly "hire, . . . recruit or refer for a fee" any undocumented alien for employment anywhere in the United States. 8 U.S.C. § 1324a(a)(1). Penalties for violations include civil fines ranging from $250 to $10,000, and criminal penalties of up to six months imprisonment and/or a $3,000 fine for pattern or practice violations. Id. § 1324a(e)(4), (f). Employers must verify the status of every person they intend to hire after the effective date of the act by examining certain specified documents that establish the person's employment authorization and identity. Id. § 1324a(b)(1). The IRCA eliminates the "Texas proviso" by removing the statutory language providing that employment shall not constitute harboring an undocumented alien. Id. § 1324.

D. Plyler and an "articulable federal policy."

In Plyler the state's principle argument was that a person's status as an undocumented alien was sufficient in itself to authorize the state to withhold from these persons benefits it might offer other residents of the state. 457 U.S. at 224. This argument is akin to the so-called "outlaw theory" under which undocumented aliens, solely because they have broken the immigration laws, are deemed to forfeit any

benefits that might accrue from their unauthorized presence in this country.  See E. Hull, Without Justice for All,  at 86-88 (1985).  The Court acknowledged the special deference the courts must accord congressional policy in the area of immigration, but cautioned that the same was not true for state policies affecting immigration:

> The States enjoy no power with respect to the classification of aliens.  This power is 'committed to the political branches of the Federal Government.'  Although it is 'a routine and normally legitimate part' of the business of the Federal Government to classify on the basis of alien status, and to 'take into account the character of the relationship between the alien and this country,' only rarely are such matters relevant to legislation by a State.  (Citations omitted.)

457 U.S. at 225.  The Court recalled that in De Canas v. Bica, 424 U.S. 351 (1976), it held that the states do possess authority to act with respect to illegal aliens, "at least where such action mirrors federal objectives and furthers a legitimate state goal."  457 U.S. 202, at 225.    In De Canas the Court upheld a California statute prohibiting an employer from knowingly employing an alien who is not entitled to lawful residence in this country if the hiring adversely affects lawful resident workers.  The California law reflected Congress' intention to prohibit the employment of all aliens except those with a grant of permission to work in this country.  The statute was thus not preempted by the Immigration and Nationality Act.

The Court also conceded that, despite the exclusive federal power to control unlawful migration,

> [i]n other contexts, undocumented status, coupled with some articulable federal policy, might enhance state authority with respect to the treatment of undocumented aliens . . . . The State may borrow the federal classification.  But to justify its use as a criterion for its own discriminatory policy, the State must demonstrate that the classification is reasonably adapted to 'the purposes for which the state desires to use it.'  (Emphasis in original, citation omitted.)

457 U.S. at 226.

The IRCA provisions described in the preceding section mark a significant change in federal policy concerning the employment of undocumented aliens in this country. The legislature might enact statutes that mirror congressional policy or it might borrow federal classifications to promote a legitimate state goal, but the legislature has not chosen to adopt such a policy for the administration of the state's vocational rehabilitation program. The legislature may not delegate to the commission the duty to determine public policy. See Clark v. Briscoe Irrigation Co., 200 S.W.2d 674, 684 (Tex. Civ. App. - Austin 1947, writ dism'd). The commission may not impose additional burdens, conditions, or restrictions in excess of or inconsistent with statutory provisions. See Bexar County Bail Bond Board v. Deckard, 604 S.W.2d 214 (Tex. Civ. App. - San Antonio 1980, no writ). Thus, the commission may not adopt the federal policy for the purposes of administering its vocational rehabilitation program. We must now consider whether the IRCA provisions will preempt the commission's efforts to provide vocational rehabilitation services to undocumented aliens.

E. Undocumented aliens' eligibility to receive public benefits.

Congress, if it so chooses, can limit an alien's access to vocational rehabilitation services. For example, under the Comprehensive Employment and Training Act, prior to amendment in 1981, undocumented aliens were excluded from the class of persons eligible to receive job training. See 20 C.F.R. § 675.5-1(b) (1980)(current version at 20 C.F.R. § 675.5-1(b)(1988)). Under several other programs, federal law or regulations specify which classes of aliens are eligible for participation. The specification of certain classes of eligible aliens serves to exclude all other classes, particularly undocumented aliens. See Wheeler and Leventhal, Aliens' Rights To Public Benefits, 20 Clearinghouse Rev. 913 (1986) and authorities cited therein. The absence of eligibility restrictions based on alienage means that even undocumented aliens may qualify for some forms of public assistance.[1]  Id.; see Attorney General Opinion WW-1274 (1962).

---

1. As the result of alienage restrictions, undocumented aliens are ineligible to receive assistance under the Aid to Families with Dependent Children program, the Food Stamp Program, federally-funded public housing, and legal

(Footnote Continued)

The passage of the IRCA did not rescind every benefit of our laws that might accrue to an undocumented alien in an employment context. For example, it did not repeal the protection that undocumented aliens receive from the Fair Labor Standards Act or the National Labor Relations Act. Patel v. Quality Inn South, 846 F.2d 700 (11th Cir. 1988). The protection of the Occupational Safety and Health Act extends to undocumented aliens in the workplace. See Hing, Handling Immigration Cases § 14.7 (1985). Undocumented aliens may even be eligible to receive unemployment disability benefits. Id.[2] Our research has revealed nothing in the IRCA or its legislative history to suggest that Congress intended to prohibit the delivery of vocational rehabilitation services to undocumented aliens. The IRCA does disqualify amnesty recipients for a period of five years from participating in many welfare programs such as Aid to Families with Dependent Children (AFDC), the Food Stamp Program, and Medicaid. 8 U.S.C. § 1255a(h). Furthermore, the IRCA requires states to verify, through the Immigration and Naturalization Service, the legal status of all aliens who apply for AFDC, Medicaid, unemployment compensation, food stamps, housing assistance, and higher education programs. Pub. L. 99-603, Pt. C, § 121, 100 Stat. 3384-94 (1986).

The inclusion of unemployment compensation applicants in the verification program is certainly indicative of an intention to eliminate the incentive to enter this country unlawfully for the purpose of obtaining employment. But just as the courts doubt that undocumented aliens enter this country for the express purpose of obtaining public benefits

---

(Footnote Continued)
aid services. Wheeler and Leventhal, supra. Undocumented aliens are theoretically eligible to receive Supplemental Security Income, Social Security (old age, survivors, and disability insurance), and unemployment compensation; however, other eligibility criteria may effectively bar undocumented aliens from receiving such benefits. Id. Because there are no alienage restrictions, undocumented aliens may be entitled to receive assistance under the Hill-Burton program, and workers' compensation and disability insurance plans. Id. As we have already seen, the Vocational Rehabilitation Act contains no alienage-based restrictions on eligibility.

2. Compare note 1, supra, regarding general unemployment benefits.

or the protection of labor laws, see Plyler, 457 U.S. at 228; Patel, 846 F.2d at 704, we doubt that undocumented aliens enter this state to avail themselves of the commission's vocational rehabilitation program. The commission readily concedes that it has rarely had occasion to consider the immigration status of any applicant for its services. If the IRCA reforms prove effective, it is likely that the commission will seldom be confronted with this issue in the future. Thus, we think it is significant that states are not required to verify the legal status of alien applicants for vocational rehabilitation services. This omission, coupled with the absence of any alienage-based eligibility requirement in either the Vocational Rehabilitation Act or the Human Resources Code, effectively eliminates the commission's authority to prescribe such a qualification. See Bexar County Bail Bond Board v. Deckard, supra.

We recognize the obvious paradox of providing vocational rehabilitation services to persons who cannot be lawfully employed in this country. The commission has attempted to conform to federal immigration policy by withholding its services from undocumented aliens, see 40 T.A.C. § 163.5(g)(5) (providing that illegal aliens are ineligible for vocational rehabilitation services), but federal law does not place the onus of compliance with immigration policy on the commission. Rather, it is the duty of employers to verify the legal status of persons employed after the date specified in the IRCA. Furthermore, since the IRCA only punishes persons knowingly hiring, recruiting, or referring undocumented aliens to employment for a fee, the commission need not be concerned about violating federal law by providing vocational rehabilitation services to suspected undocumented aliens. See 8 U.S.C. § 1324a(a)(1). Also, since Congress has specified those programs in which the states are given the duty of verifying alien applicants' status, the omission of vocational rehabilitation programs suggests that Congress was not so alarmed by the prospect of providing such services to undocumented aliens as to include such programs in the verification system. Accordingly, we conclude that the Commission for the Blind may not deny vocational rehabilitation services to adults who are undocumented aliens. In light of this answer, we need not address your third question.

## S U M M A R Y

The Texas Commission for the Blind must provide services to visually handicapped children eligible to receive such services without regard to their immigration status. The commission may not deny vocational rehabilitation services to adults who are undocumented aliens.

Very truly yours,

**J I M   M A T T O X**
Attorney General of Texas

MARY KELLER
First Assistant Attorney General

LOU MCCREARY
Executive Assistant Attorney General

JUDGE ZOLLIE STEAKLEY
Special Assistant Attorney General

RICK GILPIN
Chairman, Opinion Committee

Prepared by Steve Aragon
Assistant Attorney General