Dear Mr. Coolidge:
On behalf of the Board of Commissioners of the West Volusia Hospital Authority, you ask substantially the following question:
What are the obligations of the West Volusia Hospital Authority to provide access to healthcare for otherwise eligible illegal aliens residing within the district?
The West Volusia Hospital Authority was recreated as an independent special tax district by Chapter 04-421, Laws of Florida, for the purpose of providing access to healthcare for indigent residents of the district.[1] Section 1 of the district's charter provides:
"An independent special tax district is hereby created and incorporated to be known as `The West Volusia Hospital Authority' in Volusia County for the purpose of, either directly or through third parties, providing access to healthcare for indigent residents of the district ("purpose"). Health care is to be provided or overseen by licensed health care professionals or entities and may only be provided for nonindigents and nonresidents incidental to the provision of services to indigent residents of the district. This purpose is hereby found and declared to be a public purpose and necessary for the general welfare of the residents of the district,. . . ."
While you recognize that certain specific programs, such as Medicaid and the Florida Kidcare Program, have their specific guidelines, your inquiry addresses the general authority of the district to provide healthcare to illegal aliens living within the district. You state that no part of the district's enabling legislation makes a distinction regarding the immigration status of the person; the act itself only identifies two characteristics for qualification for healthcare access: residency within the district and indigency. You therefore state that it is your opinion that illegal aliens may qualify for services by the hospital authority. Moreover, you conclude that inasmuch as the enabling legislation does not distinguish between residency based on immigration or citizenship status, such aliens should be treated in the same manner as other residents of the district. Based upon my review of this issue, I concur.
While I am aware of such decisions such as Dequervain v.Desguin,[2] in which the court held that aliens holding only temporary visas could not claim a homestead exemption since they could not form the requisite intent to become permanent residents as required by law, the enabling legislation for the West Volusia Hospital Authority does not state that permanent residency is required to obtain services. The meaning of "resident" is generally dependent upon the purposes and goals of the statute in which the term is used. The courts, however, have generally stated that a person is a resident if he or she lives in a place and has no present intention of leaving.[3]
In Maldonado v. Allstate Insurance Company,[4] the court considered whether a person's status as an illegal alien was relevant to the residence requirement in section 627.736(4)(d)(4), Florida Statutes, regarding personal injury protection benefits. After reviewing the statute, the court concluded that the term "resident" in the statute was intended by the Legislature as a pure residence requirement, and not as a requirement for domicile, legal residence, or citizenship.
Other jurisdictions also have determined that illegal aliens can qualify as residents under a variety of state statutes. For example, inCaballero v. Martinez,[5] the New Jersey court held that an undocumented alien's intent to remain within the state could satisfy the intent required by the state's Unsatisfied Claim and Judgment Fund Law to qualify as a "resident." The court recognized the paradox that exists when an undocumented alien intends to remain in the state but, because of his or her illegal status, is subject to deportation at any time. The court held, however, that the test for residency was a subjective one based on a person's intent at the time of the accident and did not require that a person's intent to remain be realized. Thus, the fact that an undocumented alien might at some point be deported did not necessarily defeat the intent to remain.
In St. Joseph's Hosp. Medical Ctr. v. Maricopa County,[6] the Arizona Supreme Court struck down a county's attempt to limit a statutory obligation of counties to reimburse private hospitals for rendering emergency care to indigent county residents by adding the adjective "legal." The court stated:
"Instead of reimbursing private hospitals for emergency medical care rendered to indigent `residents,' the county, by its own regulation, seeks to limit its duty to reimbursing only for such care to `legal residents.' The legislature is obviously aware of the considerable number of undocumented aliens in our state. Had it wished to limit emergency care to legal residents, or attempt to impose on private hospitals a duty to provide such care to `illegals' without reimbursement, it could have supplied the missing adjective itself. We believe the regulation is inconsistent with the legislature's choice not to limit the statutory language."[7]
The intent of the West Volusia Hospital Authority's enabling legislation appears to be to provide medical services to those indigents who are living within the district. In light of the above and until clarified by the Legislature or the courts, I am therefore of the opinion that the term "residents of the district" in the enabling legislation for the authority was intended by the Legislature as a pure residence requirement, and not as a requirement for domicile, legal residence, or citizenship. Thus, the enabling legislation for the authority would appear to permit the authority to provide services to otherwise qualified indigent illegal aliens living within the district. Inasmuch as Chapter 04-421, Laws of Florida, does not distinguish between the types of indigent residents, it appears that the hospital authority should provide healthcare access to these aliens on the same basis as other indigent residents.
Sincerely,
Bill McCollum Attorney General
BC/tjw
[1] See s. 3, Ch. 04-421, Laws of Fla. And see s. 189.429, Fla. Stat., regarding the codification of special districts' charters.
[2] 927 So. 2d 232 (Fla. 2nd DCA 2006). And see Juarrero v.McNayr, 157 So. 2d 79, 81 (Fla. 1963) (alien residing in the United States with a temporary visa "does not have the legal ability to determine for himself his future status and does not have the ability legally to convert a temporary residence into a permanent home" for purposes of homestead exemption). See s. 196.031(1), Fla. Stat., which provides:
"Every person who, on January 1, has the legal title or beneficial title in equity to real property in this state and who resides thereon and in good faith makes the same his or her permanent residence, or the permanent residence of another or others legally or naturally dependent upon such person, is entitled to an exemption from all taxation, except for assessments for special benefits, up to the assessed valuation of [$5,000] on the residence and contiguous real property, as defined in s. 6, Art. VII of the State Constitution. . . ."
Cf. Department of Health Rehabilitative Services v. Solis, 580 So. 2d 146 (Fla. 1991), in which the Florida Supreme Court considered whether an alien seeking asylum was entitled to aid for dependent children under section 443.101(7), Florida Statutes (1985), providing that an alien could not receive unemployment benefits "unless such alien . . . otherwise is permanently residing in the United States under color of law." (e.s.) In concluding that the alien's presence was permanently residing under color of law, the Court stated:
"Unlike the word `permanent,' Congress has not defined the word `temporary.' `Temporary' and `temporarily,' however, are used in8 U.S.C. s. 1101(a)(15) in reference to students, tourists, business visitors, and specific workers. As stated in the dissent toSudomir [v. McMahon, 767 F.2d 1456, 1464 (9th Cir. 1985)]: `The common characteristics of all these temporary relationships is that they exist for a defined purpose with a defined end, and there is never any intention of abandoning the country of origin as home.' 767 F.2d at 1467
(Canby, J., dissenting). Solis, on the other hand, is seeking asylum in this country and, apparently, has no intention of returning to Nicaragua. Moreover, an asylum applicant is present in the United States with no defined end or defined purpose as set out by Congress regarding temporary aliens. The status of the Solis family will not change until the family chooses to leave this country or INS acts on the application for asylum. Thus, Solis and her children fit within the statutory definition of `permanent' better than within the statutory use of `temporary,' accord Gillar [v. Employment Division, 300 Ore. 672,717 P.2d 131 (Or. 1986)], and we find that they are permanently residing within the United States."
Id. at 149-150. And see 8 U.S.C. s. 1101(a)(31) (term "permanent" means a relationship of continuing or lasting nature, as distinguished from temporary, but a relationship may be permanent even though it is one that may be dissolved eventually at the instance either of the United States or of the individual, in accordance with law).
[3] See, e.g., Kiplinger v. Kiplinger, 147 Fla. 243, 2 So. 2d 870, 873
(Fla. 1941) (residence indicates place of abode, whether permanent or temporary; a resident is one who lives at a place with no present intention of removing therefrom); Cruickshank v. Cruickshank,420 So. 2d 914, 915 (Fla. 1st DCA 1982) (test for residency is physical presence in state and concurrent intent to remain). See also Robinson v. Fix,113 Fla. 151, 151 So. 512, 513 (Fla. 1933) (quoting Warren v. Warren,73 Fla. 764, 75 So. 35, 42 (Fla. 1917) stating:
"Any place of abode or dwelling place constitutes a `residence,' however temporary it may be, while the term `domicile' relates rather to the legal residence of a person, or his home in contemplation of law. As a result one may be a resident of one jurisdiction although having a domicile in another."
[4] 789 So. 2d 464 (Fla. 2nd DCA 2001).
[5] 897 A.2d 1026 (N.J. 2006). And see, e.g., Cabral v. State Bd. ofControl, 112 Cal. App. 3d 1012, 169 Cal. Rptr. 604 (1980) (compensation for victims of violent crime).
[6] 688 P.2d 986 (Ariz. 1984).
[7] Id. at 992.