IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

_____

IN RE THE MARRIAGE OF

**MARIA DEL CARMEN RENDON QUIJADA,**
*Appellant,*

*and*

**JULIAN JAVIER PIMIENTA DOMINGUEZ**
*Appellee.*

_____

No. CV-23-0160-PR
Filed June 18, 2024

_____

Appeal from the Superior Court in Pima County
The Honorable J. Alan Goodwin, Judge
No. D20221319
**REVERSED AND REMANDED**

Opinion of the Court of Appeals, Division Two
255 Ariz. 429 (App. 2023)
**VACATED**

_____

COUNSEL:

Siovhan S. Ayala, Peter E. Herberg (argued), Ayala Law Office, PC, Tucson,
Attorneys for Maria Del Carmen Rendon Quijada

Luke E. Brown (argued), Brown and Wohlford, PLLC, Tucson; Attorneys
for Julian Javier Pimienta Dominguez

Dennis I. Wilenchik, John D. Wilenchik, Garo V. Moughalian, Wilenchik &
Bartness, P.C., Phoenix, Attorneys for Amicus Curiae Immigration Reform
Law Institute

_____

JUSTICE BOLICK authored the Opinion of the Court, in which CHIEF JUSTICE BRUTINEL, VICE CHIEF JUSTICE TIMMER, and JUSTICES LOPEZ, and BEENE joined. JUSTICE MONTGOMERY, joined by JUSTICE KING, dissented.

_____

JUSTICE BOLICK, Opinion of the Court:

¶1          This case raises the question of whether federal immigration law divests Arizona courts of jurisdiction over a divorce sought by a TD nonimmigrant visa holder whose visa has expired. We hold that it does not.

## BACKGROUND

¶2          This case arises from an Arizona divorce proceeding initiated by Maria Del Carmen Rendon Quijada ("Rendon"), which was dismissed for lack of subject matter jurisdiction pursuant to a motion filed by her husband, Julian Javier Pimienta Dominguez ("Pimienta").

¶3          Rendon and Pimienta married in Mexico in 1999. They relocated to the United States in 2007.

¶4          Pimienta entered the United States on a TN visa. TN visas allow professionals from Canada and Mexico to work temporarily in the United States. *See* 8 C.F.R. § 214.6(d)(1). Rendon entered the United States on a TD visa. TD visas are reserved for the spouses and unmarried, minor children of TN visa holders. *See* 8 C.F.R. § 214.6(j)(1). TN and TD visa holders are "nonimmigrants" who "hav[e] a residence in a foreign country which [they have] no intention of abandoning and who [are] visiting the United States temporarily for business." 8 U.S.C. § 1101(a)(15)(B); *see also* 8 U.S.C. § 1184(e)(1) (providing that aliens "who seek[] to enter the United States" on a TN or TD visa "shall be treated as if seeking classification, or classifiable, as a nonimmigrant under section 1101(a)(15)").

¶5          Rendon's TD visa expired in March 2020. In December 2020, Rendon began seeking lawful permanent resident status by having her sister file a Petition for Alien Relative with the U.S. Citizenship and

Immigration Service. That petition was pending at the time of the trial court's August 2022 hearing on Pimienta's motion to dismiss.

¶6          In November 2020, Pimienta filed for marital dissolution in Mexico. Rendon challenged the Mexican court's jurisdiction on the ground that she lives in Arizona, not Mexico. The Mexican court dismissed the case for lack of jurisdiction.

¶7          The couple lived in Arizona before separating. Rendon continues to live in Arizona, but Pimienta moved to Virginia around March 2021. Pimienta has continued to renew his TN visa but refused to renew Rendon's TD visa.

¶8          In May 2022, Rendon filed the dissolution petition at issue here. In response, Pimienta filed a motion to dismiss for lack of subject matter jurisdiction. He argued Rendon could not establish domicile in Arizona because her TD visa precludes her from intending to remain in the state indefinitely. Despite finding that Rendon subjectively intends to remain in Arizona indefinitely, the trial court granted Pimienta's motion to dismiss. The trial court reasoned that under Ninth Circuit precedent, Rendon's TD visa precludes her from establishing domicile in the United States.

¶9          The court of appeals reversed. *In re Marriage of Quijada & Dominguez* ("*Quijada*"), 255 Ariz. 429, 436 ¶ 35 (App. 2023). Relying on *Elkins v. Moreno*, 435 U.S. 647 (1978), and *Park v. Barr*, 946 F.3d 1096 (9th Cir. 2020), the court held Rendon's TD visa precludes her from establishing a United States domicile, absent an adjustment in status. *Id.* at 434 ¶ 22. Because Rendon had begun seeking lawful permanent resident status, the court concluded that by recognizing Rendon's subjective domiciliary intent, "Arizona courts would not impede Congress's purposes and objectives," nor add to or take away from the conditions Congress imposes on TD visa holders. *Id.* at 435 ¶ 28. Thus, the court found federal immigration law did not preempt Arizona jurisdiction over the dissolution proceeding. *Id.*

¶10          Pimienta petitioned this Court for review. We granted review on three questions: (1) whether the court of appeals erred by holding that federal law does not preempt Arizona from allowing Rendon to establish domicile under Arizona law; (2) whether the court of appeals erred in

holding that 8 U.S.C. § 1184(e)(1) permits a TD visa holder to change her domiciliary intent upon entering the United States; and (3) whether the court of appeals erred in holding that *Elkins* permits TD visa holders to nullify the conditions of their visas by seeking a visa that could lead to permanent residence. Whether federal immigration law divests Arizona courts of jurisdiction over a marital dissolution where a visa holder's visa has expired is a recurring issue of statewide importance. We have jurisdiction under article 6, section 5(3) of the Arizona Constitution.

## DISCUSSION

**¶11**        We review de novo the dismissal of a case for lack of subject matter jurisdiction when, as here, the dismissal presents only a question of law. *Coleman v. City of Mesa*, 230 Ariz. 352, 356 ¶ 8 (2012).

**¶12**        This is a case about federalism; specifically, whether Arizona courts should read a federal immigration statute so broadly as to sweep aside their jurisdiction in an area of law traditionally entrusted to state determination. *See Gonzales v. Oregon*, 546 U.S. 243, 270, 274 (2006) (applying "the background principles of our federal system" to caution against reading federal statutes to displace regulation in areas traditionally entrusted to state authority).

**¶13**        The dissent seeks to avoid the federalism implications of its approach by attempting to graft onto Arizona divorce law an immigration-based legal capacity predicate. *Infra* ¶ 41. But the dissent acknowledges that "Rendon's legal inability to change her domicile to Arizona" is "due to a federal TD visa." *Id.* The dissent's pervasive fallacy is determining Arizona domestic relations jurisdiction by reference to federal immigration law, even though it confesses that such law "establishes the conditions for certain classifications of nonimmigrant visa holders to enter the United States, *regardless of Arizona's substantive law on domestic relations.*" *Infra* ¶ 54 (emphasis added).

**¶14**        The court of appeals held that there is "no binding federal law concluding that Congress has created—or even has the power to create—a uniform regulatory scheme governing domicile in state-law divorce proceedings." *Quijada*, 255 Ariz. at 435 ¶ 25. Because that holding is correct, it was unnecessary for the court to first determine that, as a matter of federal immigration law, Rendon could attempt to adjust her

immigration status to that of legal permanent resident. *Cf. id.* at 433 ¶¶ 14–15. Likewise, our resolution of the first question presented for review makes it unnecessary to decide the second and third questions.

¶15 Arizona law regarding subject-matter jurisdiction over divorces has remained unchanged for more than a half century. A.R.S. § 25-312(A)(1) requires "[t]hat one of the parties, at the time the action was commenced, was domiciled in this state . . . for ninety days before filing the petition for dissolution of marriage." Establishing domicile involves two requirements: "(1) physical presence, and (2) an intent to abandon the former domicile and remain [in Arizona] for an indefinite period of time." *DeWitt v. McFarland*, 112 Ariz. 33, 34 (1975) (emphasis omitted) (citation omitted). It does not require legal capacity under federal law. Rather, domiciliary intent, "as evidenced by the conduct of [the] person in question, becomes a question of fact." *Bialac v. Bialac*, 95 Ariz. 86, 87 (1963). Under Arizona law, domicile is a factual, not legal, determination. *Id.*; *see also Clark v. Clark*, 71 Ariz. 194, 197 (1950) (holding that domiciliary intent "is a matter of fact and may be proved as such").

¶16 Neither party disputes the trial court's finding that Rendon satisfies both domicile elements—that is, Rendon lives in Arizona and intends to remain. Rather, Pimienta argues that federal immigration law prevents Rendon from forming the subjective intent to stay indefinitely in Arizona. Specifically, because Rendon's TD visa is predicated upon an intent not to remain in the United States and makes her ineligible to adjust her immigration status, she cannot legally evidence an intent to establish Arizona domicile. But determining that Arizona courts are prohibited from recognizing a subjective domiciliary intent as a matter of federal immigration law turns on a separate finding that the federal law in question preempts state law.

¶17 The dissent chides us for moving too quickly to the preemption issue, contending that the question of jurisdiction is separate from, and antecedent to, a preemption analysis regarding a state's substantive laws. *Infra* ¶ 56. Not so. Whether federal law divests states of jurisdiction in an area like family law, that is traditionally entrusted to the states, is no less momentous than displacing a state's substantive law governing the same subject matter and no less subject to preemption scrutiny. *See Haaland v. Brackeen*, 599 U.S. 255, 265–66, 276–77 (2023)

(considering that "Congress lacks a general power over domestic relations" but holding that state family law conflicting with valid congressional legislation must give way in determining the validity of the Indian Child Welfare Act's ("ICWA") displacement of state-court jurisdiction over all child custody proceedings); *Fisher v. District Court*, 424 U.S. 382, 390 (1976) (holding that "even if . . . the Montana courts properly exercised adoption jurisdiction" in the past, "that jurisdiction has now been pre-empted" by a tribal ordinance authorized by the Indian Reorganization Act "conferring jurisdiction on the Tribal Court" and "implement[ing] an overriding federal policy which is clearly adequate to defeat state jurisdiction"); *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 333–34 (1983) (noting that "a State will certainly be without jurisdiction [over tribal lands] if its authority is preempted under familiar principles of preemption"); *United States v. Bass*, 404 U.S. 336, 349 (1971) (requiring that "Congress convey[] its purpose clearly" before courts find Congress intends "to effect a significant change in the sensitive relation between federal and state criminal jurisdiction"); *Brown v. Hotel & Rest. Emps. & Bartenders Int'l Union Loc. 54*, 468 U.S. 491, 502–03 (1984) (noting that where "unusually 'deeply rooted' local interests are at stake," such as in cases involving certain state breach of contract, trespass, and tort actions, "appropriate consideration for the vitality of our federal system and for a rational allocation of functions belies any easy inference that," in enacting the National Labor Relations Act, "Congress intended to deprive the States of their ability to retain jurisdiction over such matters"). Effectively, the dissent argues that the federal immigration statutes governing TN and TD visas create a legal capacity prerequisite to invoking state court jurisdiction over marital dissolutions. As we conclude below, federal law does not do so.

¶18 Our preemption jurisprudence is clear and consistent, and embraces the principles applied by the United States Supreme Court. Responding to the dissent's assertion that it is state law that establishes jurisdictional requirements that encompass federal immigration law, it is notable that we recently held unanimously that "[w]e will not lightly divine legislative intent to displace state law with sweeping and prescriptive federal [laws]." *Roberts v. State*, 253 Ariz. 259, 266 ¶ 21 (2022). And we held that "in our system of federalism, we do not start with federal law and apply it unless the legislature manifests a contrary intent; rather, we presume that state law prevails unless we find a manifest intent to adopt federal law." *Id.*

¶19        In *Varela v. FCA US LLC*, 252 Ariz. 451 (2022), this Court stated that "[w]e presume that federal lawmakers do not 'cavalierly preempt' state law because 'the States are independent sovereigns in our federal system,' and have historically 'had great latitude' to protect 'the lives, limbs, health, comfort, and quiet' of their citizens." *Id.* at 459 ¶ 13 (internal citation omitted) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475, 485 (1996)). We declared that this "presumption against preemption is 'particularly' strong in 'field[s] which the States have traditionally occupied.'" *Id.* (alteration in original) (quoting *Wyeth v. Levine*, 555 U.S. 555, 565 (2009)). In particular, we cautioned against finding that "state law is preempted not by what is expressed in federal law, but rather by what may be implied by federal law . . . . By venturing beyond the text of federal law, courts risk preempting state law based on something other than what has been 'made in Pursuance' of the Constitution." *Id.* at 460 ¶ 16 (quoting U.S. Const. art. VI, cl. 2). We concluded that "liberally applying implied preemption destabilizes the twin pillars of our constitutional order: federalism and the separation of powers." *Id.* ¶ 17.

¶20        Congress possesses plenary authority over immigration. *See Hines v. Davidowitz*, 312 U.S. 52, 62 (1941) ("[T]he supremacy of the national power . . . over immigration, naturalization and deportation, is made clear by the Constitution . . . ."). Hence, pursuant to the Supremacy Clause, U.S. Const. art. VI, cl. 2, when a state law clearly conflicts with federal immigration law, the state law must yield, *see Arizona v. United States*, 567 U.S. 387, 400–11 (2012) (striking down several Arizona immigration laws conflicting with the federal government's comprehensive immigration regulations). At the same time, the field of domestic relations "has long been regarded as a virtually exclusive province of the States." *Sosna v. Iowa*, 419 U.S. 393, 404 (1975); *accord Haaland*, 599 U.S. at 276–77. We therefore address the pertinent types of preemption to determine whether Congress's exercise of its immigration authority displaces Arizona's jurisdiction over nonimmigrant divorces.

¶21        The clearest and most readily dispositive form of preemption is express preemption—that is, where federal law by its own clear terms preempts state law. *See Arizona*, 567 U.S. at 399. None of the relevant federal statutes contain a preemption provision. Indeed, it is not even clear that the relevant immigration laws address domiciliary intent outside of the immigration context *at all*. *See* §§ 1101(a)(15)(B), -1184(e)(1) (classifying a person who enters the United States on a TD visa as a "nonimmigrant alien"

7

who has "a residence in a foreign country which he has no intention of abandoning and who is visiting the United States temporarily for business or temporarily for pleasure"); 8 U.S.C. § 1227(a)(1)(C)(i) ("Any alien who was admitted as a nonimmigrant and who has failed to maintain the nonimmigrant status in which the alien was admitted . . . or to comply with the conditions of any such status, is deportable."). At most, any applicability of these provisions beyond the immigration context, and specifically to the domiciliary requirements of state domestic relations law, would have to be inferred from a very broad reading of those provisions.

¶22 The Supreme Court has strongly admonished against doing that. In *Bond v. United States*, 572 U.S. 844 (2014), a unanimous Supreme Court ruled that absent a clear congressional command, a federal chemical weapons treaty could not be used to prosecute a woman for placing poisonous substances on surfaces that were touched by her husband's lover, because such usage would displace state criminal processes. *Id.* at 848. In construing the congressional enactment, the Court instructed that "it is appropriate to refer to basic principles of federalism embodied in the Constitution to resolve ambiguity in a federal statute." *Id.* at 859. In that case, the "ambiguity derive[d] from the improbably broad reach of the key statutory definition given the term . . . being defined; the deeply serious consequences of adopting such a boundless reading; and the lack of any apparent need to do so in light of the context from which the statute arose." *Id.* at 859–60. In such instances, "we can insist on a clear indication that Congress meant to reach purely local crimes, before interpreting the statute's expansive language in a way that intrudes on the police power of the States." *Id.* at 860.

¶23 In this case, such clear intent is manifestly absent. The immigration law's provisions regarding domiciliary intent exist within a self-contained statute pertaining to immigration. They do not purport to define or restrict domicile for all purposes; no intent appears to reach beyond the immigration context. Were Congress intent upon substituting its own jurisdictional confines for those of the states, it surely knows how to do so. *See, e.g.*, 25 U.S.C. § 1911(a) ("An Indian tribe shall have jurisdiction exclusive as to any State over any child custody proceeding involving an Indian child who resides or is domiciled within the reservation of such tribe, except where such jurisdiction is otherwise vested in the State by existing Federal law."). Congress did not do so here, and it would do grave damage to federalism for us to infer that it did.

¶24         Congress may also withdraw a subject from state regulation by fully occupying the field through comprehensive regulation. *See Arizona*, 567 U.S. at 399; *R.J. Reynolds Tobacco Co. v. Durham County*, 479 U.S. 130, 140 (1986). The federal government has fully occupied the area of alien registration. *See Arizona*, 567 U.S. at 401. But the relevant statutes are completely silent on domestic relations. Because divorce jurisdiction is "fundamentally unrelated" to the field of alien registration, field preemption does not apply here. *See Kansas v. Garcia*, 589 U.S. 191, 208 (2020); *contra Haaland*, 599 U.S. at 276–77 (holding that Congress could directly regulate child custody matters through ICWA, pursuant to its broad powers over Indian affairs, despite the fact that "Congress lacks a general power over domestic relations").

¶25         Nor does Arizona's jurisdiction over nonimmigrant divorce pose an obstacle to the attainment of federal immigration-law objectives. *See Arizona*, 567 U.S. at 399–400 (noting that state laws are preempted where "they stand 'as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress'" (quoting *Hines*, 312 U.S. at 67)). Pimienta urges that by asserting jurisdiction over the divorce here, the state would usurp federal authority. But this is not, as the dissent asserts, a matter of "immigration status or benefits." *See infra* ¶ 50. To the contrary, the state is simply conducting divorce proceedings in accord with Arizona laws and procedures that long predate the visa status at issue here. *Compare* 1973 Ariz. Sess. Laws ch. 139, § 2 (1st Reg. Sess.) (codifying Arizona's ninety-day domicile requirement for divorce jurisdiction), *with* 8 U.S.C. § 1184(e) (1994) (creating the TD visa). The Supreme Court has instructed that "courts should assume that 'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress.'" *Arizona*, 567 U.S. at 400 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)); *accord Wyeth*, 555 U.S. at 565; *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 146–47 (1963) (requiring "an unambiguous congressional mandate" of preemption in such cases). At oral argument, Pimienta acknowledged that *granting Rendon a divorce would have no impact on her immigration status or deportability*. It is difficult to conceive how asserting jurisdiction over such proceedings even implicates federal immigration law, much less poses an obstacle to accomplishing its objectives.

¶26         Pimienta mainly relies on "impossibility" preemption, asserting that it is impossible for Rendon to comply both with her federal

TD nonimmigrant status, which requires an intent to not remain in the country, and with the domiciliary intent requirement of Arizona divorce law. *See Florida Lime*, 373 U.S. at 142–43 (noting that preemption is present where it is a "physical impossibility for one engaged in interstate commerce" to comply with conflicting state and federal requirements).[1]

¶27 Given the presumption against preemption, the absence of express preemption, and the fact that exercising jurisdiction here would not interfere with federal immigration objectives, we will construe the law as best we can to avoid a finding of impossibility. *See Hisquierdo v. Hisquierdo*, 439 U.S. 572, 581 (1979) (providing that state family law "must do 'major damage' to 'clear and substantial' federal interests before the Supremacy Clause will demand that state law be overridden" (quoting *United States v. Yazell*, 382 U.S. 341, 352 (1966))). Here, as in *Barnett Bank of Marion County v. Nelson*, 517 U.S. 25 (1996), federal and state statutes "do not impose directly conflicting duties . . . as they would, for example, if the federal law said, 'you must sell insurance,' while the state law said, 'you may not.'" *Id.* at 31.

¶28 As noted above, Arizona determines domicile based on subjective intent and conduct, not on a detailed and complex legal determination of a person's immigration status. *See Bialac*, 95 Ariz. at 87. If someone seeking a divorce applies for a change in immigration status, that can be evidence of intent to remain in Arizona, regardless of her legal authority to do so. A legal determination of immigration status by the family court is not commanded by either state or federal law. *See Printz v. United States*, 521 U.S. 898, 935 (1997) ("Congress cannot compel the States to enact or enforce a federal regulatory program."). Granting a divorce affects Rendon's immigration status and deportability not at all.

¶29 A contrary decision, embracing the dissent's view that federal immigration law governs domicile-based jurisdiction for TN and TD visa

---

[1] Even were we to conclude that federal law controls, we are presented with no provision that dictates that a person whose visa has expired cannot change her mind about domicile. Presumably at that point, it becomes a matter of possible deportation or, if available, some form of obtaining alternative lawful status. We need not reach or resolve that question because we conclude that federal immigration law does not displace state domicile law in this context.

holders, could impact other areas of Arizona law that use domicile to determine jurisdiction and a person's legal rights and responsibilities. *See, e.g.*, A.R.S. §§ 14-2711, -2401 (administration of trusts and estates); *see also Bryant v. Silverman*, 146 Ariz. 41, 43–45 (1985) (conflict of laws in personal injury context); *Maricopa County v. Trs. of Ariz. Lodge No. 2*, 52 Ariz. 329, 338 (1938) (taxation of intangible property); *Oglesby v. Pac. Fin. Corp. of Cal.*, 44 Ariz. 449, 453 (1934) (same).

¶30        For similar reasons, several other state courts confronting this issue have concluded that federal immigration law does not deprive them of jurisdiction over divorce proceedings. In *In re Marriage of Dick*, 18 Cal. Rptr. 2d 743 (Ct. App. 1993), the California Court of Appeal held that a B-2 nonimmigrant could establish residence for the purpose of obtaining a divorce. *Id.* at 747.[2] The court held that "immigration status is, at most, evidence of domiciliary intent, but not dispositive of the residency issue as a matter of law." *Id.* at 746. The court found its conclusion was "buttressed by the different aims and purposes of immigration and dissolution law," concluding that the former does not preclude the latter when the parties "otherwise meet domiciliary requirements and when they are subject to the courts of this state for other purposes." *Id.* at 748; *accord In re Marriage of Pirouzkar*, 626 P.2d 380, 383 (Or. Ct. App. 1981) ("Whatever the consequences of [establishing subjective domiciliary intent] may be for purposes of immigration law, it is not pertinent as to the issue of domicile for the purposes of jurisdiction."); *Garcia v. Angulo*, 644 A.2d 498, 504 (Md. 1994) (holding that because "there is no certainty as to when, if ever, [the nonimmigrant] will receive a notice of deportation," the subjective intent to remain is not inconsistent with law); *Das v. Das*, 603 A.2d 139, 141–42 (N.J. Super. Ct. Ch. Div. 1992) (noting that a rule to the contrary would "require state trial courts to assume (or possibly usurp) the very function" of federal immigration authorities)[3]; *cf. Arizona*, 567 U.S. at 396 (noting that "[a]

---

[2]  The court found that "residence" was synonymous with "domicile" because it required both residence and intent to remain. *Dick*, 18 Cal. Rptr. 2d at 746. Our law requires both elements as well. *DeWitt*, 112 Ariz. at 34. For that reason, the dissent's attempt to distinguish the case, *infra* ¶ 71, is unavailing.

[3]  Other decisions holding the same include *Bustamante v. Bustamante*, 645 P.2d 40, 41–42 (Utah 1982) (noting the "uncertainty confronting an alien in knowing whether he may be accorded the right to remain indefinitely or

principal feature of the removal system is the broad discretion exercised by immigration officials").

¶31    The cases Pimienta relies on do not dictate a contrary result. *Elkins* speaks to the conditions of a nonimmigrant's visa, but it does not apply preemption analysis. 435 U.S. at 663–64. Indeed, the Court expressly did not reach the question of the effect of federal immigration law on subjective domiciliary intent under state law, *id.*, so it also did not need to address whether federal law would preempt state law. Similarly, *Toll v. Moreno*, 458 U.S. 1 (1982), is inapposite because that case merely prevents states from imposing discriminatory burdens (in that case, ineligibility for in-state university tuition) not contemplated by Congress on lawfully admitted aliens. *Id.* at 12–14. By contrast, in *Carlson v. Reed*, 249 F.3d 876 (9th Cir. 2001), the Ninth Circuit held that California could permissibly exclude TN and TD visa holders from in-state tuition eligibility because, due to their professed intention not to remain in the United States, the state "ha[d] hardly imposed on such aliens any 'ancillary burden not contemplated by Congress.'" *Id.* at 881 (quoting *Toll*, 458 U.S. at 14); *see also State ex rel. Brnovich v. Maricopa Cnty. Cmty. Coll. Dist. Bd.*, 243 Ariz. 539, 540 ¶ 1 (2018) (holding no right of undocumented immigrants to in-state tuition). There being no conflict between state and federal law, the court did not apply preemption analysis. *Carlson*, 249 F.3d at 881.

¶32    The most pertinent case on which Pimienta relies is *Park*, in which the Ninth Circuit construed federal immigration law to prohibit a B-2 nonimmigrant from establishing California domicile. 946 F.3d at 1098–99. At issue was a California statute that denied effect to a foreign divorce decree when both parties were living in California after overstaying their B-2 visas. *Id.* at 1098. The court held that because "Congress has *not* permitted B-2 nonimmigrants to lawfully form a subjective intent to remain in the United States[,] such an intent would inescapably conflict with Congress's definition of the nonimmigrant classification." *Id.* at 1099.

---

permanently under certain situations"); *Estate of Jack ex rel. Blair v. United States*, 54 Fed. Cl. 590, 599 (2002); *Maghu v. Singh*, 181 A.3d 518, 523–25 (Vt. 2018); *Gunderson v. Gunderson*, 123 Wash. App. 1035, 1037–38 (2004); *Padron v. Padron*, 641 S.E.2d 542, 543 (Ga. 2007); *Nagaraja v. Comm'r of Revenue*, 352 N.W.2d 373, 377–78 (Minn. 1984); *Cho v. Jeong*, No. 03A01-9608-CV-00257, 1997 WL 306017, at *4–7 (Tenn. Ct. App. 1997).

Accordingly, the court concluded that under federal law, the B-2 nonimmigrant could not have been domiciled in California. *Id.* at 1100.

**¶33** Technically, *Park* does not apply here as it distinguished the California Court of Appeal's decision in *Dick*, in part, on the grounds that the latter dealt (as here) with a marriage dissolution statute. *Id.* at 1100. Regardless, we are not obliged to follow Ninth Circuit precedent. *See Weatherford ex rel. Michael L. v. State*, 206 Ariz. 529, 532–33 ¶¶ 8–9 (2003). *Park* failed to engage in any meaningful preemption analysis, simply concluding that state law was displaced by federal law with which the court deemed it to conflict. 946 F.3d at 1100.

**¶34** Such a cursory approach is at great variance with Arizona jurisprudence. Most closely on point is *St. Joseph's Hospital & Medical Center v. Maricopa County*, 142 Ariz. 94 (1984), in which the Court rejected precisely the argument Pimienta makes here, that federal law precludes an undocumented immigrant from legally forming an intent to domicile in Arizona for state law purposes.[4] *Id.* at 98. The Court concluded that "[i]llegal entry into the country would not, under traditional criteria, bar a person from obtaining domicile within a state," and "[t]here is no federal impediment" to doing so. *Id.* at 99–100 (quoting *Plyler v. Doe*, 457 U.S. 202, 227 n.22 (1982)).

**¶35** Further, in *Reed-Kaliher v. Hoggatt*, 237 Ariz. 119 (2015), we held that the Arizona Medical Marijuana Act (the "AMMA") is not preempted by the federal Controlled Substances Act (the "CSA"). *Id.* at 141–42 ¶¶ 19–23. After conducting a fulsome preemption analysis, the Court concluded that in enforcing the AMMA, "the trial court would not be authorizing or sanctioning a violation of federal law," *id.* at 141 ¶ 21, and that "[t]he state-law immunity AMMA provides does not frustrate the

---

[4] *St. Joseph's* dealt with whether undocumented immigrants could become "residents" of this state such that they would statutorily qualify for indigent emergency medical treatment. 142 Ariz. at 98. The Court "treated the statutory usage of the term 'residence' as carrying the same connotations as the term 'domicile'" — specifically "a state of mind combined with actual physical presence in the state." *Id.* at 99 (quoting *Ariz. Bd. of Regents v. Harper*, 108 Ariz. 223, 228 (1972)).

CSA's goals of conquering drug abuse or controlling drug traffic," *Id.* at 141–42 ¶ 23. Those same criteria are satisfied in this case.

**¶36** Similarly, in *Arizona Farmworkers Union v. Phoenix Vegetable Distributors*, 155 Ariz. 413 (App. 1986), a case we view as much closer than the present one, an employer challenged a court order requiring the employer to rehire workers due to a violation of state labor law. *Id.* at 414. The workers were undocumented and therefore not entitled to work in this country. *Id.* The court defined the issue as "whether a state court, enforcing a state agricultural labor law, must restrict its remedies" in light of the objectives of federal immigration law. *Id.* at 416. The court declared that "[w]hen federalism is involved it is necessary to determine whether federal law has preempted state law." *Id.*

**¶37** After finding no express or field preemption, the court held it was not "impossible" for the employer to comply with both the court order and federal immigration law because federal law did not forbid employment of undocumented workers. *Id.* at 416–17. Further, the court held enforcement of state labor law did not create an obstacle to the enforcement of federal law because "[a] state court order of reinstatement does not restrain or limit the ability of the Immigration and Naturalization Service to deport illegal aliens," and a mere "speculative and indirect impact upon" federal immigration policies was insufficient to warrant preemption of state labor law. *Id.* at 417. Likewise, here, federal immigration law does not prohibit state courts from granting divorces to those whose TD visas have expired, nor does exercising jurisdiction in this context interfere with the objectives or operation of federal immigration law.

**¶38** The dissent manufactures a conflict between state and federal law that does not exist, and then demands obeisance to the purported federal mandate without the requisite preemption analysis that Supreme Court precedents, our precedents, and the principles of federalism require. The dissent and Pimienta's arguments and the authorities they rely upon miss the forest for the trees: exactly what federal policy or goal would be frustrated by adjudicating a divorce in these circumstances? Indeed, had Arizona used residency rather than domicile for divorce jurisdiction purposes, it would not even arguably present a conflict, though the consequence would be exactly the same. And if Pimienta was domiciled in

Arizona and had filed a dissolution petition, Arizona courts would inarguably have had jurisdiction over Rendon, regardless of her immigration status. Absent a clear conflict, we will not preemptively preempt our state's law.

## CONCLUSION

¶39 For the foregoing reasons, we vacate the court of appeals' opinion, reverse the trial court, and remand for the trial court to decide whether, under Arizona law, Rendon is domiciled in Arizona.

MONTGOMERY, J., joined by KING, J., dissenting.

**¶40**         Despite our strong adherence to the principles of federalism, *see, e.g.*, The Federalist (Alexander Hamilton, John Jay, James Madison) (Clinton Rossiter ed., 1999), we nonetheless dissent from the majority's failure to properly identify the nature of this case and the actual role federal law serves in disposing of the issues before us.  This case does not necessitate a defense of Arizona's virtue as a separate sovereign in our compound republic.  Instead, we need only follow our own statutory requirements informed by the conditions established by the federal government upon which Rendon entered and remained in this country since 2007.  To paraphrase Iñigo Montoya from The Princess Bride: The majority keeps calling this a case about federalism, but it is not the federalism case you think it is.  (Act III Communications 1987).

**¶41**         At its core, this case concerns the statutory requirements established by the Arizona Legislature that Arizona courts must consider when assessing jurisdiction over Rendon's petition for dissolution.  Thus, the consideration of jurisdiction as required by Arizona law concerns whether an Arizona court has the authority to decide a petition for dissolution in the first instance, not whether Arizona has the authority to enforce its laws regarding domestic relations and any conflict with federal jurisdiction to enforce immigration law.  *Compare Jurisdiction,* Black's Law Dictionary (11th ed. 2019) ("1. A government's general power to exercise authority over all persons and things within its territory . . . ."), *with Jurisdiction, id.* ("2. A court's power to decide a case or issue a decree . . . .").  Accordingly, the conclusion that Rendon cannot meet the jurisdictional requirements established by Arizona law, while due to the terms and conditions of her visa, are ultimately a consequence of Arizona, not federal law.

**¶42**         By not acknowledging the need to establish jurisdiction first, the majority goes straight to considering whether a conflict exists between federal immigration law and Arizona's substantive law of domestic relations.  Well, "have fun storming [that] castle," The Princes Bride, Valerie, (Act III Communications 1987), because, as a consequence, the majority's entire analysis is flawed from the beginning—from the misplaced invocation of the presumption against preemption, to the errant treatment of federal case law, to an inapt reliance on authority from other jurisdictions and the misapplication of our own cases.  Ultimately, given

16

that Rendon has not demonstrated that she has the legal capacity to change her domicile from Mexico to Arizona, she cannot meet Arizona's jurisdictional requirements and we respectfully must dissent.

## I. JURISDICTION AND ARIZONA'S SUBSTANTIVE LAW

### A. Jurisdiction In This Case

¶43 Before considering Rendon's petition and applying Arizona's domestic relations law to a marriage dissolution proceeding, the superior court had to make specific statutory findings. In particular, the court had to find that "one of the parties, at the time the action was commenced, was domiciled in this state" and that the domicile "has been maintained for ninety days before filing the petition for dissolution of marriage." A.R.S. § 25-312(A)(1). *See also Gnatkiv v. Machkur*, 239 Ariz. 486, 489 ¶ 8 (App. 2016) ("[T]he trial court must first resolve 'jurisdictional fact issues' where a question of jurisdiction exists . . . ." (quoting *Swichtenberg v. Brimer*, 171 Ariz. 77, 82 (App. 1991))).

¶44 The distinction between determining jurisdiction to decide a case and applying the pertinent substantive law is one this Court has recognized almost since statehood:

> Jurisdiction does not relate to the right of the parties, as between each other, but to the power of the court. The question of its existence is an abstract inquiry, not involving the existence of an equity (right) to be enforced, nor the right of the plaintiff to avail himself of it if it exists. *It precedes these questions* . . . . Have the plaintiffs shown a right to the relief which they seek? and [sic] has the court authority to determine whether or not they have shown such a right? A wrong determination of the question first stated is error, but can be re-examined only on appeal. The other question is the question of jurisdiction.

*Tube City Min. & Mill. Co. v. Otterson*, 16 Ariz. 305, 313 (1914) (emphasis added) (quoting *People v. Sturtevant*, 9 N.Y. 263, 269 (1853)); *see also Sil–Flo Corp. v. Bowen,* 98 Ariz. 77, 81 (1965) ("Jurisdiction of the subject-matter is the power to deal with the general abstract question, to hear the particular facts in any case relating to this question, and to determine whether or not

they are sufficient to invoke the exercise of that power." (quoting *Foltz v. St. Louis & S.F. Ry. Co.*, 60 F. 316, 318 (8th Cir. 1894))).

¶45        Pimienta was not domiciled in Arizona at any relevant time during these proceedings. Hence, Rendon's ability to establish domicile is a necessary condition precedent *imposed by Arizona law* for the court to exercise jurisdiction over her petition for dissolution before it could even consider the application of the relevant substantive law. *See Tanner v. Marwil*, 250 Ariz. 43, 46 ¶ 10 (App. 2020) ("The court has subject-matter jurisdiction over a marriage dissolution only if, at the time the petition for dissolution is filed, one or both parties have been domiciled in Arizona for at least 90 days."). Domicile under Arizona law requires "(1) physical presence, and (2) an intent to abandon the former domicile and remain here for *an indefinite period of time*; a new domicile comes into being when the two elements coexist." *DeWitt v. McFarland*, 112 Ariz. 33, 34 (1975) (quoting *Heater v. Heater*, 155 A.2d 523, 524 (D.C. 1959)). Thus, to have subject matter jurisdiction, the superior court had to find that Rendon had been domiciled in Arizona for ninety days before the petition for dissolution was filed.

¶46        Pimienta moved to dismiss Rendon's petition, arguing that she could not meet the domicile requirement. The parties stipulated that Rendon entered the United States with a nonimmigrant visa, pursuant to the North American Free Trade Agreement ("NAFTA"). Specifically, Rendon was admitted with a TD visa, explicitly conditioned upon her "having a residence in a foreign country which [s]he has no intention of abandoning and [was] visiting the United States temporarily for business." 8 U.S.C. §§ 1101(a)(15)(B), -1184(e)(1) (specifying that "[a]n alien who is a citizen of Canada or Mexico . . . who seeks to enter the United States" pursuant to the United States-Mexico-Canada Agreement ("USMCA"), which has replaced NAFTA and authorizes TD visas, will be classified "as a nonimmigrant under section 1101(a)(15) of this title"). Consistent with the visa conditions and as noted by the superior court, Rendon "expressly stated in her TD [v]isa applications over the course of more than a dozen years that she did not intend to remain in the United States and instead intended to return to Mexico."

¶47        Furthermore, Rendon acknowledged on cross-examination during the hearing on Pimienta's motion to dismiss that she understood that as a TD visa holder—or even as a TN visa holder—she could not

express an intent to be domiciled in Arizona. Consequently, the express conditions of her TD visa preclude her from possessing the legal capacity required to change her domicile from Mexico to Arizona. *See Texas v. Florida*, 306 U.S. 398, 425 (1939) ("When one intends the facts to which the law attaches consequences, [s]he must abide the consequences whether intended or not."). And a person may only have one domicile at a time. *See Clark v. Clark*, 124 Ariz. 235, 237 (1979) (discussing whether domicile maintained for required timeframe prior to petitioner seeking a divorce).

¶48        A person seeking to establish a new domicile must have the legal capacity to do so. *Ariz. Bd. of Regents v. Harper*, 108 Ariz. 223, 228 (1972); *see also* Restatement (Second) of Conflict of Laws § 15 (Am. L. Inst. 1971). Arizona has long recognized this proposition. *See, e.g.*, *In re Sherrill's Estate*, 92 Ariz. 39, 43 (1962) ("The domicile of a person who becomes insane remains where it was established at that time. However, if he thereafter *regains the capacity* to form an intention to change his domicile, he may do so . . . ." (internal citations omitted) (emphasis added)); *McNeal v. Mahoney*, 117 Ariz. 543, 545 (1977) ("The domicile of a minor child . . . is that of the parent to whom legal custody of the child has been given."). The determination of domicile *under Arizona law* can, therefore, require a legal, as well as a factual, inquiry. Regardless, the majority errs in concluding that it is federal immigration law that "create[s] a legal capacity prerequisite." *Supra* ¶ 17.

¶49        Furthermore, in responding to Pimienta's motion to dismiss, Rendon had the burden of establishing that she possessed the legal capacity to change her domicile. *See Gnatkiv*, 239 Ariz. at 490 ¶ 9 ("The plaintiff bears the burden of demonstrating the trial court had subject matter jurisdiction . . . ."); *Houghton v. Piper Aircraft Corp.*, 112 Ariz. 365, 367 (1975) ("The burden of proof is on the party alleging that a former domicile has been abandoned in favor of a new one."); *Valley Nat. Bank v. Siebrand*, 74 Ariz. 54, 62 (1952) ("It is . . . the rule that: The burden of proof is on one asserting that an earlier domicile was abandoned in favor of a later one.").

¶50        To this point, the focus has been on the restrictions imposed by Rendon's TD visa, first issued in 2007, and renewed annually until March of 2020. Since then, Rendon's TD visa has expired, and she has remained in the United States without lawful authority. Nothing has changed since her initial entry into the United States that permits her to

legally change her domicile from Mexico to Arizona. Although her sister has filed a petition for permanent residence on Rendon's behalf, the notice from the United States Customs and Immigration Service acknowledging receipt of the petition states in bold: "This notice does not grant any immigration status or benefits," which the majority fails to acknowledge. *See supra* ¶ 5. Rendon has failed to present *any* legal authority to establish that she has the legal capacity to change her domicile, even though it is her burden to make this showing. Thus, Rendon has no greater capacity to change her domicile today than she did when she first entered the United States in 2007.[1]

**¶51**         Equally unavailing is Rendon's argument that by virtue of overstaying her TD visa and remaining in the country without lawful authority she is "no longer subject to the statutes that preclude her from establishing a lawful subjective intent to remain in the country." As stated in *Park v. Barr*, 946 F.3d 1096, 1099 (9th Cir. 2020): "It would be inconsistent to conclude that Congress sought to preclude nonimmigrants who *comply* with federal immigration law from the benefits that flow from state domiciliary status while permitting nonimmigrants who *violate* their visa conditions to share in them." *See also Graham v. INS,* 998 F.2d 194, 196 (3d Cir. 1993) ("If petitioner complied with the terms of his temporary worker visa, then he could not have had the intent necessary to establish a domicile in this country. On the other hand, if he did plan to make the United States his domicile, then he violated the conditions of his visa and his intent was not lawful. Under either scenario, petitioner could not establish 'lawful domicile' in the United States while in this country on a nonimmigrant, temporary worker visa."). Not only is Rendon's argument problematic as *Park* observed, but it is also a perverse proposition that a legal disability can be removed by violating the very law that imposed it. Rendon offers no authority to support her proposition, and this Court should decline to endorse it.

**¶52**         The superior court was correct in dismissing her petition for lack of domicile, and therefore lack of jurisdiction. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) ("Jurisdiction is power to declare the law,

---

[1] Accordingly, because it is the capacity to establish a change in domicile that matters, not whether the federal government may or may not remove someone in the United States, the majority's discussion regarding deportation is irrelevant to the precise issue before us. *Supra* ¶ 26 n.1.

and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." (quoting *Ex parte McCardle*, 74 U.S. 506, 514 (1868))).

## B. Jurisdiction In General

**¶53** The majority's argument that the jurisdictional issues are amenable to the same type of preemption analysis as that of a conflict between substantive state and federal law assumes its own conclusion and reflects the misapprehension of the effect of federal immigration law on jurisdiction in this case. To wit, the majority posits: "Whether federal law divests states of jurisdiction in an area like family law, that is traditionally entrusted to the states, is no less momentous than displacing a state's substantive law governing the same subject matter and no less subject to preemption scrutiny." *Supra* ¶ 17. Momentous or not, the characterization that federal law somehow divests Arizona courts of jurisdiction misses the point.

**¶54** Federal immigration law does not "divest" Arizona courts of jurisdiction. Instead, it establishes the conditions for certain classifications of nonimmigrant visa holders to enter the United States, regardless of Arizona's substantive law on domestic relations. And because Arizona has chosen to condition the exercise of a court's jurisdiction over a petition for dissolution based on physical presence *and* domicile, Rendon's visa conditions have consequences under Arizona law. The ultimate consequence to her is not dictated by federal immigration law in the first instance but is, instead, due to Arizona law. In fact, if Arizona only required Rendon to *reside* in Arizona for ninety days and nothing more, jurisdiction would not be an issue. But Arizona law requires more.

**¶55** The cases cited by the majority to conflate consideration of jurisdiction to decide a case with jurisdiction to impose substantive law actually help to illustrate the issue. These cases deal with, in the first instance, conflicts between the substantive law of respective governing authorities, whether tribal, state, or federal. *Supra* ¶ 17. Because the Supreme Court found that the state substantive law was preempted, the state courts lacked jurisdiction to decide cases under state law. *See Haaland v. Brackeen*, 599 U.S. 255, 264–68 (2023) (finding that Congress had authority to enact the Indian Child Welfare Act which prescribed placement priorities for foster care and adoption that preempted state law priorities and

21

prescribed jurisdictional authority); *Fisher v. District Court*, 424 U.S. 382, 390 (1976) (deciding that Northern Cheyenne Tribe had authority to exercise jurisdiction over adoption proceedings among its members pursuant to the Indian Reorganization Act of 1934 enacted by Congress); *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 333–34 (1983) (finding that a state's efforts to apply hunting and fishing regulations to non-tribal members on tribal lands preempted by federal law and noting that "a State will certainly be without jurisdiction *if its authority is preempted* under familiar principles of preemption" (emphasis added)). Thus, in these cases, the state court's jurisdiction was preempted because federal law prevented the state from enforcing its substantive law.[2] In the matter before us, federal law informs the determination of whether Rendon can meet the jurisdictional requirements that Arizona law establishes. The lack of jurisdiction is not due to a conflict between federal immigration law and Arizona domestic relations law. Thus, federal law does not divest Arizona courts of jurisdiction and the preemption analysis the majority undertakes, in as much as it considers whether there is a conflict between substantive federal and state law, is misplaced. *Supra* ¶¶ 17–28.

## II. PREEMPTION

### A. Presumption Against Preemption

**¶56** The majority's assertion that this case involves the exercise of "jurisdiction in an area of law traditionally entrusted to state determination," *supra* ¶ 12, further reflects the failure to distinguish between determining jurisdiction to decide a case and applying the substantive law. This failure then leads to a misplaced reliance on the presumption against preemption as discussed in *Varela v. FCA US LLC*, 252 Ariz. 451 (2022). *Supra* ¶ 19.

---

[2] The remaining cases address typical preemption due to a conflict between substantive bodies of law or are completely inapposite. *Brown v. Hotel & Rest. Emps. & Bartenders Int'l Union Loc. 54*, 468 U.S. 491, 494 (1984) (addressing conflict between the National Labor Relations Act and New Jersey statutes regulating gambling and the qualifications of union officials); *United States v. Bass*, 404 U.S. 336, 349 (1971) (discussing balance between federal government and the states in the realm of criminal jurisdiction).

**¶57**         In *Varela*, the preemption argument addressed whether the inaction of a federal regulatory agency precluded a personal injury jury trial.  252 Ariz. at 457 ¶ 2.  Because the case involved tort law, it was an accurate statement that the "presumption against preemption is 'particularly' strong in 'field[s] which the States have traditionally occupied.'"  *Id.* at 459 ¶ 13 (alteration in original) *(*quoting *Wyeth v. Levine*, 555 U.S. 555, 565 (2009)) (noting that tort actions are a traditional field occupied by states).  There are important distinctions between *Varela* and the matter before us, though.

**¶58**         First, this case involves a congressional enactment pursuant to a negotiated treaty between the United States, Canada, and Mexico under an express, enumerated delegation of authority under the Constitution. *See* U.S. Const. art. I, § 8, cl. 303–4 ("The Congress shall have Power . . . [t]o establish an uniform Rule of Naturalization" and "[t]o regulate Commerce with foreign Nations."); 8 U.S.C. §§ 1184(e)(1), -1101(a)(15)(B); *see also* 8 C.F.R. § 214.6.  This is not the kind of assertion of implied preemption due to the absence of action by a regulatory agency with inferred preemptive effect.

**¶59**         Second, the conditions governing the entry and continued presence of nonimmigrants in the United States—let alone treatymaking in the case of NAFTA and the USMCA—are not fields in "which the States have traditionally occupied."  *Varela*, 252 Ariz. at 459 ¶ 13 (quoting *Wyeth*, 555 U.S. at 565).  The presumption against preemption as discussed in *Varela* therefore does not apply here and, in this case, the principles of federalism are strengthened when state courts decline to exercise authority precluded by the proper use of powers delegated to the federal government.[3]

---

[3] The need for uniform rules regarding naturalization was noted by James Madison as one of the shortcomings of the Articles of Confederation.  James Madison, *Vices of the Political System of the United States, April 1787* no. 5 (Founders Online, Nat'l Archives 1787) ("Instances of inferior moment are the want of uniformity in the laws concerning naturalization.") https://founders.archives.gov/documents/Madison/01-09-02-0187  (last visited Mar. 30, 2024).

## B. Impossibility Preemption[4]

¶60      Although there is no conflict between Arizona's law of domestic relations and federal immigration law, the majority has created one with respect to jurisdiction over Rendon's petition for dissolution. Federal law clearly says one thing—Rendon lacks the legal capacity to change her domicile from Mexico to the United States—and the majority reasons otherwise. *Supra* ¶¶ 27–28. But Rendon cannot have the legal capacity to be domiciled in Arizona and lack the legal capacity to be domiciled in the United States at the same time. *See* Aristotle, *The Metaphysics*, Book IV 1005b (John H. McMahon trans., Prometheus Books 1991) (concluding that "it is impossible for the same [woman] to suppose at the same time that the same thing is and is not"). Thus, we clearly have a case where "it is impossible for [Rendon] to comply with both state and federal requirements." *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990). Accordingly, the Supremacy Clause dictates that we follow the federal law that precludes Rendon from changing her domicile to Arizona. *See* U.S. Const. art. VI, § 1, cl. 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; *and the Judges in every State shall be bound thereby*, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." (emphasis added)).

### III. OTHER AUTHORITY

¶61      Given the fact that we have not previously considered an issue like the one before us, it makes sense to consult other jurisdictions that have addressed a similar issue. *See, e.g.*, *Hullett v. Cousin*, 204 Ariz. 292, 296 ¶ 20 (2003) (noting that where a case is "a matter of first impression for Arizona, we look to cases from other jurisdictions having similar statutes"). But the impact of conflating a court's jurisdiction to consider a case and the jurisdiction of a governing authority to promulgate applicable substantive law rears its ugly head once again. Consequently, the majority disregards cases that are on point with respect to the impact that the conditions of Rendon's TD visa have on her capacity to change her domicile and

---

[4] Because impossibility preemption is dispositive, it is not necessary to analyze the other forms of preemption.

embraces other state cases that neither address capacity in this context nor reflect our jurisprudential principles.

## A. Federal Cases

**¶62** In considering the federal cases cited to us, the majority observes that we are not obligated to follow Ninth Circuit precedent. *Supra* ¶ 33. Fair enough. But in the same case cited for this point, *Weatherford ex rel. Michael L. v. State*, 206 Ariz. 529, 532 ¶ 8 (2003), this Court also noted that "state courts look first to decisions of the United States Supreme Court. Although only a decision of the Supreme Court binds a state court on a substantive federal issue, a number of state supreme courts have elected to follow, as far as reasonably possible, their federal circuits' decisions on questions of substantive federal law." *Id.* That makes sense where "consistent decisions among federal and state courts further predictability and stability of the law. Therefore, if the Ninth Circuit has announced a clear rule on an issue of *substantive federal statutory law* . . . we will look first to the Ninth Circuit rule in interpreting *substantive federal statutory law*." *Id.* at 533 ¶ 9 (emphasis added). With respect to this case, the Ninth Circuit has squarely addressed the issue presented and announced a clear rule of substantive federal law that also relies on Supreme Court decisions addressing visa considerations relevant to our case, all of which do "dictate a contrary result" than the one the majority reaches. *Supra* ¶ 31.

**¶63** *Carlson v. Reed*, 249 F.3d 876 (9th Cir. 2001), is instructive regarding the consequences of the conditions of Rendon's visa on legal capacity. "The specific question before us, therefore, is the proper interpretation of section 68062(h), which provides that aliens are eligible for classification as California residents only if they possess the legal capacity to establish 'domicile in the United States' under federal immigration law." *Id.* at 878. As the court explained, "[t]he TD visa category is for dependents of TN visa holders." *Id.* at 880. "The 'TN' visa category was created pursuant to . . . NAFTA, which provides that '[e]ach party shall grant *temporary entry* . . . to a business person seeking to engage in a business activity at a professional level . . . if the business person otherwise complies with existing immigration measures applicable to *temporary entry*.'" *Id.* (alterations in original) (quoting North American Free Trade Agreement, 32 I.L.M. 605, 664 (1993)). The court then traced the genesis of the language of the California statute before it to the Supreme Court's analysis in *Toll v. Moreno*, 458 U.S. 1 (1982). *Carlson*, 249 F.3d at 879. Therein, the Supreme

Court stated, "[w]ith respect to the nonimmigrant class [of the Immigration and Nationality Act (the "INA")], the [INA] establishes various categories . . . . *For many of these nonimmigrant categories, Congress has precluded the covered alien from establishing domicile in the United States.*"  *Toll*, 458 U.S. at 13–14 (emphasis added).  Rendon is in such a category.

**¶64**　　　　The *Carlson* court went on to set forth the specific regulations covering Rendon's visa as promulgated by the Attorney General in 8 C.F.R. § 214.6(b):

> Temporary entry, as defined in the NAFTA, means entry without the intent to establish permanent residence. The alien must satisfy the inspecting immigration officer that the proposed stay is temporary. *A temporary period has a reasonable, finite end that does not equate to permanent residence.* In order to establish that the alien's entry will be temporary, the alien must demonstrate to the satisfaction of the inspecting immigration officer that his or her work assignment in the United States will end at a predictable time *and that he or she will depart upon completion of the assignment.*

*Carlson*, 249 F.3d at 880 (emphasis added).  The court thus concluded that the plaintiff "*lack[ed] the legal capacity* to establish domicile in the United States within the meaning of *Elkins* and *Toll*."  *Id.* at 881 (emphasis added).

**¶65**　　　　The majority states that the basis for distinguishing *Carlson* is that the Ninth Circuit did not engage in a preemption analysis given the lack of a conflict between state and federal law.  *Supra* ¶ 31.  But for the majority's error in overlooking Rendon's lack of a legal capacity to establish domicile in the first place, we would not have a conflict here either, and it is only because of the continuing jurisdictional oversight that the majority overlooks *Carlson*'s treatment of the same issue of legal capacity that we have here.  *See Carlson*, 249 F.3d at 878 (quoting a California statute regarding in-state tuition and concluding that "aliens are eligible for classification as California residents *only if they possess the legal capacity* to establish 'domicile in the United States' under federal immigration law" (emphasis added)).

¶66    The next federal case referenced is also instructive for considering the import of visa restrictions. *Park* considered the restrictions of a B-2 visa, similar to Rendon's TD visa, that "requires nonimmigrants to maintain a residence in their country of citizenship with no intention of abandoning it." 946 F.3d at 1099 (citing 8 U.S.C. § 1101(a)(15)(B)). *Park* goes on to reason: "It follows that Congress has *not* permitted B-2 nonimmigrants to lawfully form a subjective intent to remain in the United States; such an intent would inescapably conflict with Congress's definition of the nonimmigrant classification." *Id.* In support of this conclusion, *Park* cited *Elkins v. Moreno*, 435 U.S. 647 (1978), and *Toll*, 458 U.S. at 14 & n.20. *Park*, 946 F.3d at 1099. It behooves us to consider *Elkins*, as well.

¶67    *Elkins* arose from the University of Maryland's denial of in-state tuition to students who were in the United States as G-4 visa holders.[5] 435 U.S. at 652–54. The Supreme Court characterized the main issue as "whether, as a matter of federal and Maryland law, G-4 aliens can form the intent necessary to allow them to become domiciliaries of Maryland." *Id.* at 658. With respect to federal law, the Supreme Court initially addressed the nature of a G-4 visa and stated, "it is clear that Congress *did not* require G-4 aliens to maintain a permanent residence abroad or to pledge to leave the United States at a date certain." *Id.* at 664 (emphasis added). Accordingly, the Court concluded: "Under present law, therefore, were a G-4 alien to develop a subjective intent to stay indefinitely in the United States he would be able to do so without violating either the 1952 Act, the Service's regulations, or the terms of his visa." *Id.* at 666.

¶68    Nevertheless, the Supreme Court made it clear that nonimmigrants cannot establish domicile where "Congress expressly conditioned admission . . . on an intent not to abandon a foreign residence," which is the situation before us with the TD visa. 435 U.S. at 665; *see also Toll*, 458 U.S. at 14 & n.20 (citing the nonimmigrant classification described at § 1101(a)(15)(B) as one in which "Congress has precluded the covered alien from establishing domicile in the United States"); *Gaudin v. Remis*, 379 F.3d 631, 636–38 (9th Cir. 2004) (concluding citizen of Canada who

---

[5] A G-4 visa is a "nonimmigrant visa granted to 'officers, or employees of . . . international organizations, and the members of their immediate families' pursuant to 8 U.S.C. § 1101(a)(15)(G)(iv) (1976 ed.)." *Elkins*, 435 U.S. at 652 (alteration in original).

possessed a nonimmigrant visa pursuant to 8 U.S.C. § 1101(a)(15)(B) could not, as a matter of law, permanently relocate to the United States).

**¶69**         *Park*'s analysis and that of the Supreme Court are readily applicable and pertinent to the facts before us and support the conclusion that Rendon failed to meet her burden that she possessed the legal capacity to establish domicile in Arizona. If she possessed a visa like the G-4 visa, then she would have the legal capacity to change her domicile and an Arizona court would then be able to exercise jurisdiction over her petition. Rather than "simply concluding that state law was displaced by federal law with which the court deemed it to conflict" or having engaged in a "cursory approach," *supra* ¶¶ 33–34, *Park* engaged in a thoughtful review of the issue before it and of relevant Supreme Court case law, and we should follow it.

## B. State Court Cases

**¶70**         Instead of following applicable federal cases, the majority embraces other state court cases supporting the conclusion "that federal immigration law does not deprive them of jurisdiction over divorce." *Supra* ¶ 30. As previously discussed, whether federal immigration law impacts a state's jurisdiction over divorce has more to do with what the state requires for jurisdiction rather than any overt requirement of federal immigration law. Nonetheless, not a single case discussed or even acknowledged the legal capacity issue and none of them addressed the conditions of a TD visa. Given the myriad issues in these cases and for the following stated reasons, we would be wise to reject them.

**¶71**         Two cases illustrate best the issues with reliance on other state cases. The first, *In re Marriage of Dick*, 18 Cal. Rptr. 2d 743, 746 (Ct. App. 1993), asserted that, pursuant to California law regarding jurisdiction for divorce cases, "residency is synonymous with domicile, the latter term meaning 'both the *act* of residence and an *intention* to remain.'" This Court, however, has not conflated residency with domicile in the domestic relations context. In fact, we have clearly stated that domicile and residence are distinct requirements. *See Clark*, 124 Ariz. at 237 ("Domicile is primarily a state of mind *combined* with actual physical presence in the state. Either, without the other, is insufficient." (emphasis added) (quoting *Harper*, 108 Ariz. at 228)). Mere residence is not enough.

**¶72** Additionally, conflating residency with domicile confuses rather than clarifies the distinct requirements for jurisdiction in Arizona courts. *See Brandt v. Brandt*, 76 Ariz. 154, 158 (1953) ("'Residence' and 'domicile' are not synonymous at common law, nor does the one term necessarily include the other. Saying that residence is not a jurisdictional prerequisite is not equivalent to saying that domicile is not essential to a valid decree."). There is no reason for us to countenance such confusion. *See, e.g., Duncan v. Scottsdale Med. Imaging, Ltd.*, 205 Ariz. 306, 310 ¶ 13 (2003) (acknowledging the problem caused by "[t]he inconsistent use of . . . 'lack of informed consent,' . . . and 'lack of consent,'" and that it "blurred the distinction between" the two); *State v. Green*, 248 Ariz. 133, 136 ¶ 12 (2020) (addressing wide and varied interpretations of statute governing probation for drug possession offenses); *Satamian v. Great Divide Ins.*, 545 P.3d 918, 930 ¶ 37 (Ariz. 2024) (addressing accrual of claims and noting that "Arizona's accrual jurisprudence has not been a paragon of clarity").

**¶73** Finally, the majority highlights the *Dick* court's finding that its conclusion was "buttressed by the different aims and purposes of immigration and dissolution law," concluding that the former does not preclude the latter when the parties "otherwise meet domiciliary requirements and when they are subject to the courts of this state for other purposes." *Supra* ¶ 30 (quoting 18 Cal. Rptr. 2d at 748). But this conclusion and its rationale are problematic because to "otherwise meet domiciliary requirements" given "the different aims and purposes of immigration and dissolution law" disregards the distinction between jurisdiction to hear a case and the substantive law to apply in deciding the case. *See supra* ¶ 30. Given our own recognition of the jurisdictional inquiry distinction, there is no reason for us to follow the rationale or conclusion of *Dick* or the cases it relied on. *See* 18 Cal. Rptr. 2d at 747–48.[6] Instead, this Court should adhere

---

[6] Additionally, one of the cases *In re Dick* relied on, *Cocron v. Cocron*, 375 N.Y.S.2d 797 (Sup. Ct. 1975), is no longer good law. The case was superseded by statute as stated in *Unanue v. Unanue*, 141 A.D.2d 31 (N.Y. App. Div. 1988). Therein, the court explained that "residence" as used in the state's divorce jurisdiction statute had been interpreted to be synonymous with the term "domicile," as recognized in *Cocron*. *Unanue*, 141 A.D.2d at 37. However, the court noted that "the bulk of cases so holding" were decided prior to certain amendments to the state's domestic relations laws. *Id.* The court then noted with approval that following the

to its own assertion that "Congress has the ultimate say in immigration matters and Arizona is bound under the Supremacy Clause of the United States Constitution to follow federal law." *Ariz. ex rel. Brnovich v. Maricopa Cnty. Cmty. Coll. Dist. Bd.*, 243 Ariz. 539, 543 ¶ 18 (2018).

**¶74**        The second case, *In re Marriage of Pirouzkar*, 626 P.2d 380 (Or. Ct. App. 1981), also cited by *Dick*, 18 Cal. Rptr. 2d at 747, is no more helpful. The statute in question provided: "When the marriage was not solemnized in this state . . . at least one party must be a resident of *or* be domiciled in this state at the time the suit is commenced and continuously for a period of six months prior thereto." *Pirouzkar*, 626 P.2d at 381 (emphasis added) (quoting O.R.S. § 107.075(2)). Rather than apply the plain meaning of the words of the statute, the court traced the history of interpreting its language to conclude: "When jurisdiction is dependent upon domicile our statutes have generally used the words 'resident' or 'inhabitant' and it has been uniformly held that these words, when used in such statutes, are synonymous with 'domicile.'" *Id.* at 382 (quoting *Fox v. Lasley*, 318 P.2d 933 (Or. 1957)). But resident and domicile are not synonymous for determining jurisdiction under Arizona law. Notably, though, the *Pirouzkar* court also stated that it had not been presented with any authority to conclude "that federal immigration law prevents the states from allowing [nonimmigrant visa holders] such as that of [the] wife in this case to establish a domicile of choice in this country." 626 P.2d at 383. We have been presented with such authority. *See* Part II(A) ¶¶ 46–47.

## IV. OTHER CONCERNS

**¶75**        The majority expresses other concerns and raises points regarding other areas of the law, previously decided cases, and the complexities of federal immigration law. None of these concerns, though, justify overlooking the effect of Rendon's lack of legal capacity on the determination of jurisdiction and her failure to meet her burden to establish jurisdiction.

---

amendments, courts had "declined to equate residency . . . with domicile" and were "adhering to the literal definition of residence." *Id.* at 37–38.

## A. Superior Court Competence

¶76        In addressing impossibility preemption, the majority also expresses concern regarding the need for the superior court to determine immigration status and notes that "[a] legal determination of immigration status by the family court is not commanded by either state or federal law." *Supra* ¶ 28.  Although it is true that federal law does not "command" an Arizona court to determine Rendon's immigration status, Arizona law does require, as discussed above, a superior court to make findings regarding domiciliary intent to establish jurisdiction, which may involve an inquiry such as the one before us.  But fear not.  The task before the court is nothing like the three terrors of the fire swamp.  *See* The Princess Bride (depicting flame spurts, lightning sand, and rodents of unusual size).  All a court need do, as the superior court did in this very case, is consider the relevant evidence to determine whether it has jurisdiction.[7]  *See, e.g.*, *Seafirst Corp. v. Ariz. Dep't of Revenue*, 172 Ariz. 54, 56 (Tax Ct. 1992) (noting that in a challenge to subject matter jurisdiction, "the Court should receive such evidence as is necessary to permit the Court to determine the merits of the motion").

¶77        In particular, the superior court here was able to read, just as we can, the relevant statutes and consider the parties' stipulation regarding the nature and conditions of Rendon's TD visa.  The court was also able to read "Exhibit 9," admitted in the hearing on the motion to dismiss, which was the notice from the United States Customs and Immigration Service acknowledging receipt of Rendon's sister's petition that stated in bold: "This notice does not grant any immigration status or benefits."  The court was fully capable of ascertaining the relevant information to render its decision.

## B. Other Areas of Law

¶78        The majority also expresses concern that finding Rendon unable to establish domicile in this case "*could* impact other areas of Arizona law," but does not give any explanation of what the impact might

---

[7] Arizona law requires consideration of similar issues in other contexts. *See, e.g.*, A.R.S. § 46-140.01 (requiring "agenc[ies] of this state and all of its political subdivisions" to "verify the immigration status" of applicants for certain state and local public benefits).

be. *Supra* ¶ 29 (emphasis added). Nevertheless, each statute or case referenced is not in any way negatively impacted by a determination that Rendon lacks the legal capacity to establish domicile in Arizona due to her former visa status and because she failed to provide *any* legal authority that allows her to establish legal capacity and change domicile. *See* A.R.S. § 14-2401 ("This article applies to the estate of a decedent who dies domiciled in this state."); A.R.S. § 14-2711(A) (referring to "the intestate succession law of the designated individual's domicile"); *Bryant v. Silverman*, 146 Ariz. 41, 42 (1985) (discussing conflict of laws analysis in a wrongful death case and stating that "this Court has adopted the rules embodied in the Restatement (Second) of Conflicts (1971) to analyze and solve conflicts problems arising in Arizona"); *Maricopa County v. Trs. of Ariz. Lodge No. 2, F. & A. M.*, 52 Ariz. 329, 338 (1938) ("It is well settled that the situs of intangibles for purposes of taxation is the domicile of the owner and not that of the debtor."); *Oglesby v. Pac. Fin. Corp. of Cal.*, 44 Ariz. 449, 453 (1934) (noting "that the situs of shares of stock in a corporation is the domicile of the owner of the shares"). Denying jurisdiction due to a lack of legal capacity does not affect the operation of the law for any of the statutes or cases cited.

## C. Previous Arizona Cases

**¶79**　　　　The majority addresses several prior Arizona cases to support its analysis and conclusion. These cases are not helpful in deciding the issue before us. None of the cases had occasion to consider the discrete issue of legal capacity to change one's domicile.

**¶80**　　　　In *St. Joseph's Hospital and Medical Center v. Maricopa County*, 142 Ariz. 94 (1984), the contention was that the unlawful presence of three individuals who received medical care relieved Maricopa County of the obligation to pay for indigent emergency medical treatment. *Id.* at 97–98. In analyzing whether someone present in Arizona without lawful authority could qualify for indigent medical treatment, the Court noted that to qualify, "the patient [had to] be indigent and 'a *resident* of the county for the preceding twelve months.'" *Id.* at 98 (emphasis added) (quoting A.R.S. 11-297(A) (1973)).[8] Thus, the need to establish domicile, let alone the legal

---

[8] The Court noted that the Supreme Court had previously held the durational aspect of the residency requirement unconstitutional in *Memorial Hospital v. Maricopa County*, 415 U.S. 250 (1974). *St. Joseph's*, 142 Ariz. at 100.

capacity to change it, was not at issue. Accordingly, this Court's discussion of residence and domicile as interchangeable terms is classic dicta. A plain reading of the statutory requirement did not include any reference, implied or otherwise, to domicile and was not necessary to determine the issue. *See Barrows v. Garvey*, 67 Ariz. 202, 206 (1948) ("Statements and comments in an opinion concerning some rule of law or legal proposition not necessarily involved nor essential to determination of the case in hand are obiter dicta, and lack the force of an adjudication." (quoting *Obiter Dictum*, Black's Law Dictionary, 575 (3d ed. 1933))). That the majority relies on this case, *supra* ¶ 34, is akin to suffering "a nice paper cut and pour[ing] lemon juice on it." The Princess Bride, Miracle Max.

**¶81** The reliance on *Reed-Kaliher v. Hoggatt*, 237 Ariz. 119 (2015), is likewise unhelpful because the preemption analysis comparing the Arizona Medical Marijuana Act and the federal Controlled Substances Act is inapposite to the facts of this case, as is the conclusion regarding preemption. *Id.* at 124–25 ¶¶ 19–23.

**¶82** Finally, *Ariz. Farmworkers Union v. Phx. Vegetable Distribs.*, 155 Ariz. 413 (App. 1986), is not helpful for the majority's argument. In concluding that "[n]either the language of the INA nor legislative history indicates that Congress intended to preempt enforcement of state agricultural labor laws," the court went on to quote *De Canas v. Bica*, 424 U.S. 351, 359 (1976): "[t]he central concern of the INA is with the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country." *Ariz. Farmworkers*, 155 Ariz. at 416 (alteration in original). Accordingly, the trial court's order of reinstatement "*does not actually conflict* with federal law. Under the INA, employers are not prohibited from employing undocumented aliens, even those subject to a final order of deportation or awaiting voluntary departure. Thus, an employer can reinstate [such] worker without violating the INA." *Id.* at 417 (emphasis added).[9] Thus, unlike what occurs here with the assertion of

---

[9] Additionally, the federal law at issue in *Arizona Farmworkers* is no longer good law. *See Kansas v. Garcia*, 589 U.S. 191, 195 (2020) ("With the enactment of [the Immigration Reform and Control Act of 1986 (IRCA)], Congress took a different approach. IRCA made it unlawful to hire an alien knowing that he or she is unauthorized to work in the United States. 8 U.S.C. §§ 1324a(a)(1)(A), (h)(3).").

jurisdiction over Rendon's petition for dissolution, the action by the superior court did not in any way conflict with federal immigration law.

## V. CONCLUSION

**¶83**      Rendon has failed to establish that she has the legal capacity under federal law to establish domicile in the United States, and therefore she cannot legally be domiciled in Arizona. She cannot meet her burden of establishing jurisdiction for an Arizona court to consider her petition for dissolution. We would therefore find that the court of appeals erred with respect to the three issues presented, vacate the court of appeals' opinion, and affirm the trial court's judgment dismissing the matter.